STATE of Utah, Petitioner,

v.

The Honorable Michael L. HUTCHINGS, Judge, Third Judicial District Court, Salt Lake County, Utah, Respondent.

Glen Earl Lloyd, Real Party in Interest.

No. 970304–CA.

Court of Appeals of Utah.

Nov. 28, 1997.

Jan Graham, Robert K. Hunt, and Charlene Barlow, Salt Lake City, for Petitioner.

D. Gilbert Athay, Loni F. DeLand and Michael R. Sikora, Salt Lake City, for Real Party in Interest.

Before DAVIS, P.J., WILKINS, Associate P.J., and JACKSON, J.

DAVIS, Presiding Judge:

The State filed a Petition for Extraordinary Writ seeking review of the magistrate's order refusing to bind over Glenn Earl Lloyd II (hereinafter referred to as defendant) on ten counts of money laundering and one count of pattern of unlawful activity. We grant the State's petition in part and deny it in part.

## I. FACTS

A state investigator began an investigation of defendant's affairs after receiving information regarding a fraudulent securities investment scheme involving defendant and several Utah doctors. The investigator discovered that defendant had convinced the doctors to invest in what defendant described as low-risk, viable businesses. The businesses, however, were shell bank accounts over which defendant had sole control. Defendant was

ultimately charged with twenty-four counts of securities fraud in violation of Utah Code Ann. §§ 61–1–1, –7 (1997), ten money laundering counts in violation of Utah Code Ann. § 76–10–1903 (Supp.1996), and one count of pattern of unlawful activity in violation of Utah Code Ann. § 76–10–1603 (1995).

A preliminary examination was held to determine whether defendant should be bound over for trial on all thirty-five counts as charged in the information. The following are the uncontroverted findings of fact made by the magistrate:

a. During all times relevant to the charges presented (1991 through 1994), defendant maintained an investment advisor business entitled Applied Financial Concepts through which he gave investment advice, assisted individuals in investing their money and transferred individuals' money to various investments.

b. The defendant represented himself as an investment advisor to the following individuals: Dr. Stephen Bennett, Dr. Roger Sheffield, Dr. William Ellingson, Dr. Elmo Gruwell, Dr. Ronald Saunders, Dr. Joseph Nelson, Dr. Paul Robinson, Dr. Wendell Gadd and Dr. Alan Rappleye.

c. In his capacity as an investment advisor, defendant personally met with each of the above-referenced individuals to discuss investing in one or more of the following companies: F.C. Leasing, CC Management, Cross Country Management, Peak Strategy Management, Sourceline Capital, AFC Inter–Cap, Internal Capitalization Partnership, Tempus Utile, FC Finance, and AFC.

d. In each meeting, defendant described the above-referenced companies as existing, viable companies doing business in the State of Utah.

e. The defendant told each physician that his investments were low risk and that his principal would be returned in a period of one to three years and during that time period, the physicians would receive monthly or quarterly interest payments, ranging from eight to fourteen percent.

f. After the physicians were offered the securities, the physicians agreed to invest in the described business and, in each instance, physically handed the defendant a check issued to the specific business in which they had decided to invest.

g. The defendant opened the following checking accounts through the use of registered and unregistered dbas: Sourceline Capital ..., FC Finance ..., FC Leasing ..., AFC ..., Peak Strategy Management ..., Cross Country Management ..., AFC Inter–Cap ..., Tempus Utile ..., CC Management ..., and Internal Capitalization Management.... The defendant was the sole signatory on these accounts and defendant was the only person who deposited or withdrew money out of these accounts.

h. There were two Sourceline Capital accounts, one at Draper Bank and one at First Security Bank. The Sourceline Capital account at Draper Bank listed Jerry Sheets as a signatory and is not relevant to the State's money laundering charge. However, the First Security Bank Sourceline Capital account ... was established by the defendant and he was the sole signatory.

i. After the defendant personally received the victims' checks, he deposited the checks into the above-referenced accounts which he owned and controlled. These accounts bore the name of the security offered the victim so the money could be deposited into that account. The deposits occurred as follows:

* Dr. Sheffield's $10,000.00 to "Sourceline Capital" ...

* Dr. Nelson's $40,394.00 to FC Finance ...

* Dr[.] Rappleye'[ ]s $29,250, Dr. Saunders'[s][ ] $25,000.00, Dr. Ellingson's $20,000.00, Dr. Bennett's $20,000.00, and Dr. Gadd's $15,000.00 to FC Leasing ...

* Dr. Rappleye's $10,000.00, Dr. Gruwell's $10,000.00, and Dr. Nelson's $10,000.00 to AFC ...

* Dr. Nelson's $70,000.00 and Dr. Bennett's $20,625 to Peak Strategy Management ...

* Dr. Nelson's $25,000.00 and Dr. Bennett's $10,000.00 to Cross Country Management . . .

* Dr. Bennett's $20,000.00 and Dr. Saunders['s] $15,000.00 to AFC Inter–Cap . . .

* Dr. Saunder's $25,000.00 to Tempus Utile . . .

* Dr. Nelson's $90,000.00 to CC Management . . .

* Dr. Bennett's $15,000.00 and Dr. Gadd's $15,000.00 to Internal Capitalization Management. . . .

j. Cross Country Management at Bank One listed Myron Lee Abbott and Edward C. Parker as signatories. However, Dr. Nelson's $25,000.00 was the opening deposit in that account on July 20, 1993. On that same day, $10.00 cash was also placed in the account. On July 27, 1993, Myron Abbott issued a check for $25,000.00 from the Cross Country Account to FC Finance, an account over which the defendant had sole control. Other than these three transactions, no other money went in or out of the Cross Country Management account during the week of July 20–27, 1993. Within one week, the defendant gained control over Dr. Nelson's $25,000.00, which Dr. Nelson was told would be invested in a business entitled Cross Country Management.

k. At all times relevant hereto, the defendant told the victims that their proceeds were invested in the existing, viable, Utah companies which he initially offered them and that the proceeds were not in his control. Defendant refused to answer the physicians' questions regarding the proceeds' location, nature and control.

l. Each time a victim actually received an alleged interest payment on his investment, he would receive it in the form of a cashier's check drawn on a bank and not from the alleged investment entity or even the defendant-controlled account by the same name.

m. After the physicians' funds were deposited into one or more of the defendant-controlled accounts, the spreadsheets[1] . . . established that the following relevant activity occurred: 1) Funds would be withdrawn and deposited in the various defendant-controlled accounts; 2) Funds would be withdrawn from the defendant-controlled accounts and deposited into one or more of the defendant's personal accounts; 3) Funds would be withdrawn from the defendant-controlled accounts and transferred to other entities not controlled by the defendant; or 4) Funds would be deposited into the defendant-controlled accounts from other entities not controlled by the defendant.

n. The spreadsheets from each defendant-controlled account . . . established and explained the deposit and withdrawal activity which occurred specifically between the ten defendant-controlled accounts as well as the defendant's personal checking accounts.

o. However, the State presented no testimony explaining the withdrawal and deposit activity in the defendant-controlled accounts relating to entities not controlled or established by the defendant such as Star King, Adalyn Financial, Capstone and Towers, among others.

p. Furthermore, the State's witness which testified as to the above-described accounts could not tell the Court whether these defendant-controlled accounts were interest bearing.

q. During the time defendant was transferring these funds between his accounts and to himself, he continued to maintain his investment advisor company, Applied Financial Concepts, and continued to represent himself as an investment advisor.

At the end of the hearing, the magistrate concluded that sufficient probable cause existed to bind defendant over on the twenty-four counts of securities fraud. However, the magistrate found no evidence of an enterprise, a necessary element of the pattern of unlawful activity count, *see* Utah Code Ann. § 76–10–1603 (1995), and therefore refused

---

**1.** At the preliminary examination, the State introduced spreadsheets identifying all of the fictitious business accounts opened by defendant and the relevant transactions regarding those accounts and the victims' money.

to bind defendant over on this charge. Additionally, the magistrate concluded that no evidence was presented showing that defendant intentionally concealed the whereabouts of the doctors' investments and, therefore, no probable cause existed supporting the money laundering counts. Accordingly, the magistrate refused to bind defendant over on these charges. The one count of pattern of unlawful activity and ten counts of money laundering were therefore dismissed.

The State appealed the magistrate's order refusing to bind defendant over on the eleven counts. However, the State's appeal was dismissed by this court for lack of jurisdiction based on the holding of *State v. Quinn*, 930 P.2d 267 (Utah Ct.App.1996). In the per curiam memorandum decision dismissing the appeal, this court "note[d that] the State is free to bring a proper petition for extraordinary relief if it is so inclined." *State v. Lloyd*, No. 960214 (Utah Ct.App. March 27, 1997). Because this court invited the State to proceed via an extraordinary writ, we consider that ruling the law of the case, *see Sittner v. Big Horn Tar Sands & Oil, Inc.*, 692 P.2d 735, 736 (Utah 1984), and proceed on the merits of the State's petition.[2]

## II. ISSUES AND STANDARD OF REVIEW

The issues presented in the State's petition are as follows: (1) Did the magistrate err by concluding that there was no probable cause to bind defendant over on the pattern of unlawful activity count because the State failed to establish the existence of an "enterprise?" (2) Did the magistrate err by concluding that there was no probable cause to bind defendant over on the money laundering counts because the State failed to establish that defendant intended to conceal or disguise the proceeds from his unlawful activity?

"[T]he ultimate decision of whether to bind a defendant over for trial presents a question of law which we review de novo without deference." *State v. Jaeger*, 896 P.2d 42, 44 (Utah Ct.App.1995).

## III. ANALYSIS

### A. Pattern of Unlawful Activity

We first address the State's argument that the magistrate erred by refusing to bind defendant over on the pattern of unlawful activity (commonly known as racketeering) count. *See* Utah Code Ann. § 76–10–1603 (1995).[3] To prevail on a racketeering charge under section 76–10–1603, the State must prove "that (1) the defendant is engaged in a pattern of unlawful activity and (2) the defendant is involved in an enterprise." *Holbrook v. Master Protection Corp.*, 883 P.2d 295, 302 (Utah Ct.App.1994). Although the magistrate concluded that the State had sufficiently established the pattern of unlawful activity element,[4] he concluded that no enterprise existed.[5] The State argues that the magistrate misapplied the law in reaching its conclusion and that sufficient evidence was

---

**2.** We are not approving the propriety of seeking review of the magistrate's ruling via an extraordinary writ, but rather we only treat the decision as the law of the case to which we will adhere.

**3.** Section 76–10–1603 is included within the Utah Pattern of Unlawful Activity Act (UPUA), codified at Utah Code Ann. §§ 76–10–1601 to –1609 (1995 & Supp.1996), and provides, in relevant part:

(1) It is unlawful for any person who has received any proceeds derived, whether directly or indirectly, from a pattern of unlawful activity in which the person has participated as a principal, to use or invest, directly or indirectly, any part of that income, or the proceeds of the income, or the proceeds derived from the investment or use of those proceeds, in the acquisition of any interest in, or the establishment or operation of, any enterprise.

(2) It is unlawful for any person through a pattern of unlawful activity to acquire or maintain, directly or indirectly, any interest in or control of any enterprise.

(3) It is unlawful for any person employed by or associated with any enterprise to conduct or participate, whether directly or indirectly, in the conduct of that enterprise's affairs through a pattern of unlawful activity.

Utah Code Ann. § 76–10–1603(1)–(3) (1995).

**4.** Defendant does not challenge that conclusion.

**5.** At a preliminary examination, the State has the burden to prove "probable cause ... that the crime charged has been committed and that the defendant has committed it." Utah R.Crim. P. 7(h)(2).

presented to establish the existence of an enterprise.

> Because Utah law on this issue is sparse, and because the provisions of [UPUA] are nearly identical to those contained in the [Federal Racketeer Influenced and Corrupt Organizations Act (RICO)] ..., we look to the law of other states and to federal case law for guidance on these issues. *Brickyard Homeowners' Ass'n Management Comm. v. Gibbons Realty,* 668 P.2d 535, 540 (Utah 1983) ("Identity in language [in Utah and federal statutes] presumes identity of construction, so that we look to federal ... law for guidance."). The provisions of [UPUA] at issue in this case are virtually identical to those in [RICO], and under the facts in this case, we adopt the federal courts' interpretations as Utah law. We reserve the right to adopt a different construction for [UPUA] than that given to [RICO] should our statute or the facts warrant.

*Buzas Baseball, Inc. v. Salt Lake Trappers, Inc.,* 925 P.2d 941, 947 n. 5 (Utah 1996); *see also State v. Bell,* 770 P.2d 100, 101 n. 1 (Utah 1988) (recognizing that UPUA (formerly referred to as RICE) was "modeled after the federal 'RICO' statute").

### 1. Section 76–10–1603(1)

Defendant was charged under three subsections of section 76–10–1603. *See* Utah Code Ann. § 76–10–1603 (1995). We begin our analysis with subsection (1) of section 76–10–1603, which provides:

> It is unlawful for any person who has received any proceeds derived, whether directly or indirectly, from a pattern of unlawful activity in which the person has participated as a principal, to use or invest, directly or indirectly, any part of that income, or the proceeds of the income, or the proceeds derived from the investment or use of those proceeds, in the acquisition of any interest in, or the establishment or operation of, any enterprise.

*Id.* § 76–10–1603(1). The RICO correlative is almost identical in all respects, except for the interstate and foreign commerce element:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C.A. § 1962(a) (West 1984).

"Section 1962(a) prohibits a person who has received income derived from a pattern of racketeering activity from using the income in the operation of an enterprise...." *New Beckley Mining Corp. v. International Union, United Mine Workers,* 18 F.3d 1161, 1165 (4th Cir.1994). "A 1962(a) violation occurs not when the defendant engages in the predicate acts, but only when he uses or invests the proceeds of that activity in an enterprise." *Brittingham v. Mobil Corp.,* 943 F.2d 297, 304 (3rd Cir.1991). "This provision was primarily directed at halting the investment of racketeering proceeds into legitimate businesses, including the practice of money laundering." *Id.* at 303.

Because the magistrate concluded that the State failed to establish the existence of an enterprise, the issue before us is what constitutes an "enterprise" under UPUA. UPUA statutorily defines an "enterprise" as "any individual, sole proprietorship, partnership, corporation, business trust, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, and includes illicit as well as licit entities." Utah Code Ann. § 76–10–1602(1) (1995). The RICO counterpart is almost identical: " '[E]nterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C.A. § 1961(4) (West 1984).

The United States Supreme Court in *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), identified the

elements of proof necessary for a conviction under RICO:

> [T]he Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. 18 U.S.C. § 1961(1) (1976 ed., Supp. III). The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.

*Id.* at 583, 101 S.Ct. at 2528–29.

■ Although the necessary proof of an enterprise under *Turkette* is that "of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit," *id.* at 583, 101 S.Ct. at 2528, we are somewhat constrained by this definition because in the present case the defendant is not a "group of persons associated together for a common purpose of engaging in a course of conduct," *id.,* as were the defendants in *Turkette.* To the contrary, we have one defendant with several bank accounts. Notwithstanding, because the UPUA and RICO definitions of an enterprise include a sole proprietorship, we hold that proof of an enterprise involving a sole proprietorship must include evidence of "an ongoing organization, formal or informal, and [include] evidence that [a sole proprietor] function[s] as a continuing unit." *Id.*

■ The magistrate's uncontested findings provide that "[d]uring all times relevant to the charges presented (1991 through 1994), defendant maintained an investment advisor business entitled Applied Financial Concepts through which he gave investment advice, assisted individuals in investing their money and transferred individuals' money to various investments." The magistrate concluded, however, "that as a matter of law, there was no probable cause to suggest that defendant's use of his investment advisor business, Applied Financial Concepts ... demonstrated the existence of an enterprise," and, furthermore, "that the evidence used to establish the existence of the investment advisor company ... only further establishes and proves the elements of the pattern (the securities fraud and the sale of unregistered securities), and not the existence of an enterprise." The State argues, however, that it "presented evidence regarding the probable existence of two alternative enterprises: 1) Defendant's investment advisor business, Applied Financial Concepts, and/or 2) an association-in-fact enterprise consisting of defendant and the various registered and unregistered businesses he purported to represent." The State maintains that the magistrate based its conclusion on the erroneous belief that the evidence used to prove the pattern of unlawful activity element could not also be used to prove the existence of an enterprise, and that the UPUA defendant could not also be the UPUA enterprise.

*Turkette* briefly addressed the question of whether the State can use the same proof to establish both the pattern element and the enterprise element. There the Court stated:

> While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.

*Id.* at 583, 101 S.Ct. at 2529.

The majority of the federal circuit courts agree that the same set of facts used to

prove a pattern of racketeering may be used to prove a RICO enterprise. *See United States v. Sanders*, 928 F.2d 940, 943 (10th Cir.1991) ("Although the pattern of racketeering activity and the enterprise are separate elements of a RICO violation, the government need not necessarily adduce different proof for each element."); *United States v. Qaoud*, 777 F.2d 1105, 1115 (6th Cir.1985) ("Although 'enterprise' and 'pattern of racketeering activity' are separate elements, they may be proved by the same evidence."); *United States v. Mazzei*, 700 F.2d 85, 89 (2nd Cir.1983) (holding "proof of [pattern of unlawful activity and enterprise need not] be distinct and independent, as long as the proof offered is sufficient to satisfy both elements"); *United States v. Cagnina*, 697 F.2d 915, 921 (11th Cir.1983) ("Although both an enterprise and a pattern of racketeering activity must be shown, ... the proof used to establish the two elements may in particular cases coalesce."); *United States v. Bagnariol*, 665 F.2d 877, 890 (9th Cir.1981) ("[T]he government is not precluded from using the same evidence to establish both the element of an enterprise and the element of a pattern of racketeering."); *United States v. Griffin*, 660 F.2d 996, 999 (4th Cir.1981) (stating "proof of [enterprise] may overlap proof of the connecting pattern of racketeering activity"); *United States v. Elliott*, 571 F.2d 880, 899 (5th Cir.1978) (relying on pattern of racketeering activity to prove existence of enterprise). The Eighth Circuit, however, has adopted a contrary view and requires that proof of the pattern of racketeering activity be separate and distinct from the proof of an enterprise. *See United States v. Anderson*, 626 F.2d 1358, 1372 (8th Cir.1980).

The rationale behind allowing the same set of facts to support a conclusion of a pattern of unlawful activity and an enterprise was succinctly set forth in *Mazzei*, 700 F.2d at 89. There, the appellant argued that proof of the enterprise must be distinct from proof of the pattern of racketeering activity. *See id.* at 88. The court disagreed, stating:

There is nothing in the language or legislative history of the Act to support the appellant's view. Moreover, it does not make sense to impose a "distinctness" requirement in RICO cases. The appellant would have us rule that his actions are beyond the purview of RICO because he engaged only in point shaving and did not commit criminal acts other than those specifically contemplated in the conspiracy. [The appellant's] interpretation would lead to the anomalous result that a large scale underworld operation which engaged solely in trafficking of heroin would not be subject to RICO's enhanced sanctions, whereas small-time criminals jointly engaged in infrequent sales of contraband drugs and illegal handguns arguably could be prosecuted under RICO. The Court will not place its *imprimatur* on such a counterproductive interpretation.

*Id.* at 89.

In contrast, the Eighth Circuit has held that RICO "requires an association with an enterprise which is distinct from participation in the conduct of the enterprise through a pattern of racketeering activity." *United States v. Bledsoe*, 674 F.2d 647, 663 (8th Cir.1982). The Eighth Circuit rationalizes its conclusion by stating, "If the enterprise element is satisfied by proof of conspiracy or looser associations not characterized by conspiratorial consent, the heightened punishment[6] can only be justified by the requirement of two acts of racketeering and thus the [Racketeering] Act is merely a recidivist statute." *Id.* at 664. *But see United States v. Kragness*, 830 F.2d 842, 855 (8th Cir.1987) (recognizing that proof of both enterprise and pattern of racketeering "'may in particular cases coalesce'" (quoting *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2529)).

Although the issue was not specifically before it, the Utah Supreme Court has implicitly ruled that the same set of facts used to prove the pattern of unlawful activity can be used to prove the existence of an enterprise. In *State v. McGrath*, 749 P.2d 631 (Utah

**6.** "Violation of RICO may be punished by a fine of up to $25,000 or imprisonment for up to 20 years or both, while conspiracy to commit an offense against the United States carries a maxi- mum penalty of a $10,000 fine and five years imprisonment. *Compare* 18 U.S.C. § 1963(a) *with* 18 U.S.C. § 371." *Bledsoe*, 674 F.2d at 664.

1988), the defendant was charged with eight counts of distribution of a controlled substance and one count of racketeering in violation of the Utah Racketeering Influences and Criminal Enterprise Act (RICE).[7] *See id.* at 632–33. After the State presented its case at trial, it amended the eighth count to attempted distribution of a controlled substance. *See id.* at 633. The jury convicted the defendant of the one count of attempted distribution of a controlled substance and the racketeering count, but found the defendant not guilty of the seven counts of distribution of a controlled substance. *See id.*

On appeal, the defendant argued that the State had failed to prove either a pattern of unlawful activity or an enterprise. With respect to the State's alleged failure to prove a pattern of unlawful activity, the court concluded that based on the evidence it was entirely reasonable to find the defendant guilty of supplying cocaine to another for resale. *See id.* at 634. Regarding the State's alleged failure to prove the existence of an enterprise, the defendant argued "that the State adduced evidence that tended to show at most the existence only of a pattern of racketeering activity, but not an enterprise." *Id.* at 636–37. The court rejected defendant's argument and held that there was sufficient evidence to establish the existence of an enterprise. *See id.* at 637. The evidence relied on by the court to support its enterprise determination was that of defendant's cocaine trafficking, the same evidence used to establish the pattern of unlawful activity element of RICE. *See id.* at 635–37. Thus, the same facts used to establish a pattern of unlawful activity were used to establish the existence of an enterprise.

We agree with the analysis of the majority of the federal circuits and the implicit holding in *McGrath* and therefore hold that the State may use the same set of facts used to establish a pattern of unlawful activity to prove a UPUA enterprise.

■ We turn now to the issue of whether the "person" under UPUA's section 76–10–1603(1) can be the same entity as the "enterprise" under the same subsection. Several federal circuits addressing this issue concluded that the "person" and the "enterprise" may be one and the same for purposes of section 1962(a) based on the absence of any limiting language in RICO to the contrary. *See Brittingham,* 943 F.2d at 303 ("[T]here is no requirement that a § 1962(a) defendant be distinct from the enterprise."); *Schofield v. First Commodity Corp.,* 793 F.2d 28, 31 (1st Cir.1986) ("The language in section 1962(a) does not require ... the involvement of two separate entities."); *Haroco, Inc. v. American Nat'l Bank & Trust Co.,* 747 F.2d 384, 402 (7th Cir.1984) ("Subsection (a) [of section 1962] does not contain any ... language ... suggest[ing] that the liable person and the enterprise ... be separate."), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). However, "[t]he 'person' and 'enterprise' combination liability can only occur when the corporation actually is the direct beneficiary of the pattern of racketeering activity." *Garbade v. Great Divide Mining & Milling Corp.,* 831 F.2d 212, 213 (10th Cir.1987). "[A]n individual defendant ... can ... be charged under ... section [1962(a)] as a 'person' who used income derived from a pattern of racketeering activity in the operation of an 'enterprise' (himself)." *United States v. DiCaro,* 772 F.2d 1314, 1320 (7th Cir.1985).

Analogous to RICO section 1962(a), section 76–10–1603(1) does not contain any limiting language precluding the "person" from being the same entity as the "enterprise." Accordingly, we hold that, for purposes of section 76–10–1603(1), "the liable 'person' and the 'enterprise' can be the same entity," *DiCaro,* 772 F.2d at 1320, under section 76–10–1603(1), as long as the "person" is "actually ... the direct beneficiary of the pattern of racketeering activity," *Garbade,* 831 F.2d at 213.

■ We now turn to whether the magistrate's refusal to bind defendant over for trial on the count of pattern of unlawful activity under section 76–10–1603(1) was in error. We note that "[p]reliminary hearings are adversarial proceedings in which the prosecu-

---

**7.** RICE was codified at Utah Code Ann. §§ 76–10–1601 to –1609 (1978 & Supp.1986). RICE was retitled "Pattern of Unlawful Activity Act" in 1987. *See* 1987 Utah Laws ch. 238, § 1.

tion must present sufficient evidence to establish that 'the crime charged has been committed and that the defendant has committed it.'" *State v. Pledger,* 896 P.2d 1226, 1229 (Utah 1995) (quoting Utah R.Crim. P. 7(h)(2)). "The prosecution is not required to introduce enough evidence to establish the defendant's guilt beyond a reasonable doubt, but must present a quantum of evidence sufficient to warrant submission of the case to the trier of fact." *State v. Anderson,* 612 P.2d 778, 783 (Utah 1980); *accord Pledger,* 896 P.2d at 1229. "In making a determination as to probable cause, the magistrate should view the evidence in a light most favorable to the prosecution and resolve all inferences in favor of the prosecution." *Pledger,* 896 P.2d at 1229. "Moreover, '[u]nless the evidence is wholly lacking and incapable of reasonable inference to prove some issue which supports the [prosecution's] claim,' the magistrate should bind the defendant over for trial." *Id.* (alteration in original) (citation omitted).

■ We need not look further than the magistrate's uncontroverted findings of fact to conclude that the State presented sufficient evidence showing that an enterprise existed under subsection (1) of section 76–10–1603. The State presented two theories for the existence of an enterprise: the existence and use of Applied Financial Concepts, and the association-in-fact enterprise among defendant and the numerous registered and unregistered businesses he claimed to represent.

The magistrate found that "[d]uring all times relevant to the charges presented (1991 through 1994), defendant maintained an investment advisor business entitled Applied Financial Concepts through which he gave investment advice, assisted individuals in investing their money and transferred individuals' money to various investments." Applied Financial Concepts was a sole proprietorship, which falls squarely within the definition of enterprise under section 76–10–1602(1). Thus, there was sufficient evidence that Applied Financial Concepts was an informal, ongoing organization that functioned as a continuing unit. *See Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528. Accordingly, the

State "present[ed more than] a quantum of evidence sufficient to warrant submission of the case to the trier of fact," *Anderson,* 612 P.2d at 783, and the magistrate erred by refusing to bind defendant over on the pattern of unlawful activity count under subsection (1) of section 76–10–1603 of the Utah Code.

■ We are unpersuaded by the State's alternate theory, namely that an association-in-fact enterprise existed among defendant and the bank accounts in the names of fictitious registered and unregistered dbas. The magistrate concluded that there was no evidence suggesting that "defendant's ... use of various licit and illicit dbas in establishing the checking accounts wherein he deposited the physicians' checks demonstrated the existence of an enterprise" and "that the evidence used to establish the existence of ... the various dbas is evidence which only further establishes and proves the elements of the pattern (the securities fraud and the sale of unregistered securities), and not the existence of an enterprise."

Stripped to the essentials, the registered and unregistered dbas to which the State refers are nothing more than shell bank accounts. As the Fifth Circuit has noted,

> "[I]nanimate objects, such as coffee, or intangible rights, such as contract rights, cannot possibly constitute a RICO 'enterprise,' which must be either an individual or a 'legal entity,' such as a corporation, or an association of 'individuals.'" A bank account is a debt that a bank owes to the depositor. Thus, it is closely analogous to the 'intangible rights, such as contract rights' ... and is not analogous to a legal entity such as a corporation or to an association of individuals, and therefore cannot constitute an "enterprise" under RICO.

*Guidry v. Bank of LaPlace,* 954 F.2d 278, 283 (5th Cir.1992) (citation omitted).

As with the RICO definition, UPUA does not define an enterprise as including an inanimate object such as a bank account. *See* Utah Code Ann. § 76–10–1602(1) (1995) (defining "enterprise" as "any individual, sole proprietorship, partnership, corporation, business trust, association, or other legal en-

tity, and any union or group of individuals associated in fact although not a legal entity, and includes illicit as well as licit entities"). Therefore, defendant's "association" with the bank accounts cannot fall within any conceivable reading of the statutory definition of an enterprise, and the State's alternate theory of an enterprise necessarily fails.

### 2. Section 76–10–1603(2)

Defendant was also charged under section 76–10–1603(2), which provides "[i]t is unlawful for any person through a pattern of unlawful activity to acquire or maintain, directly or indirectly, any interest in or control of any enterprise." Utah Code Ann. § 76–10–1603 (1995). The parallel provision in RICO provides "[i]t shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C.A. § 1962(b) (West 1984).

■ "Sectión [1962](b) prohibits a person from acquiring an interest in an enterprise through a pattern of racketeering activity." *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1307 (7th Cir.1987). Similar to section 1962(a), section 1962(b) does not require that the "person" and the "enterprise" be distinct. *See Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535 n. 3 (9th Cir.1992) ("[S]ection 1962(b) contains no requirement that the 'person' and the 'enterprise' be distinct."); *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 907 (3rd Cir.1991) (stating section 1962(b) does not require "separate identity" between "person" and "enterprise"); *Landry v. Air Line Pilots Ass'n Int'l AFL–CIO*, 901 F.2d 404, 425 (5th Cir.1990) ("[T]he RICO person and the enterprise need not be distinct for a person to be held liable under subsection (b)."); *Liquid Air*, 834 F.2d at 1307 ("[S]ubsection (b) does not require the existence of an enterprise separate and distinct from the person sought to be held liable."). We agree with the foregoing and hold that the "person" and "enterprise" within section 76–10–1603(2) need not be separate and distinct.

Because we have determined that the State provided sufficient evidence showing that Applied Financial Concepts qualified as an enterprise under subsection (1) of section 76–10–1603, we hold that there was sufficient evidence establishing the existence of an enterprise under subsection (2) of section 76–10–1603. Accordingly, the magistrate erred by concluding that an enterprise did not exist under section 76–10–1603(2) and by refusing to bind defendant over thereunder.

### 3. Section 76–10–1603(3)

■ We now address subsection (3) of UPUA section 76–10–1603 and subsection (c) of RICO section 1962. The UPUA subsection provides that "[i]t is unlawful for any person employed by or associated with any enterprise to conduct or participate, whether directly or indirectly, in the conduct of that enterprise's affairs through a pattern of unlawful activity." Utah Code Ann. § 76–10–1603(3) (1995). Subsection (c) of section 1962 provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C.A. § 1962(c) (West 1984).

Whether a "person" can be the same entity as an "enterprise" under subsection (c) has been the topic of lengthy discussion in RICO jurisprudence, and only one federal circuit has held that the "person" can be the same as the "enterprise" for the purposes of section 1962(c). *See United States v. Hartley*, 678 F.2d 961, 986 (11th Cir.1982) ("[W]e hold that a corporation can simultaneously be named as a defendant *and* satisfy the 'enterprise' requirement under RICO [section 1962(c) ]."). The remaining federal circuit courts have held that the "person" must be a separate and distinct entity from the "enterprise." *See Doyle v. Hasbro, Inc.*, 103 F.3d 186, 190 (1st Cir.1996) ("[U]nder section 1962(c), 'the unlawful enterprise itself cannot also be the person . . . .' " (citation omitted));

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 344 (2nd Cir.1994) ("We have determined that [for section 1962(c) purposes,] the person and the enterprise referred to must be distinct."); *New Beckley Mining Corp.,* 18 F.3d at 1163 (stating section 1962(c) "envisions the enterprise as 'being different from, not the same as or part of, the person.'" (citation omitted)); *Sever,* 978 F.2d at 1534 ("[A] corporate defendant cannot be both the RICO person and the RICO enterprise under section 1962(c)."); *Brittingham,* 943 F.2d at 300 ("[T]he 'person' charged with violation of § 1962(c) must be distinct from the enterprise."); *Puckett v. Tennessee Eastman Co.,* 889 F.2d 1481, 1489 (6th Cir.1989) ("It is plain that the language of [section 1962(c)] precludes the 'person' conducting or participating in an enterprise's affairs from simultaneously serving as the 'enterprise.'"); *Garbade,* 831 F.2d at 213 (stating corporate defendant could not be "both an 'enterprise' and a 'person' within the purposes and wording of [section 1962(c)]"); *Bishop v. Corbitt Marine Ways, Inc.,* 802 F.2d 122, 123 (5th Cir.1986) ("[W]here [section 1962(c)] violations are concerned, the 'person' and the 'enterprise' must be distinct."); *DiCaro,* 772 F.2d at 1319 ("[A] defendant cannot be convicted under section 1962(c) as both the 'person' and the 'enterprise' that had its affairs conducted through a pattern of racketeering activity."); *Bennett v. Berg,* 685 F.2d 1053, 1061–62 (8th Cir.1982) (dismissing count naming identical defendant and enterprise).

These jurisdictions base their conclusions on the plain language of the statute, which prohibits "any person employed by or associated with any enterprise" to conduct the enterprise through a pattern of racketeering activity. 18 U.S.C.A. § 1962(c) (West 1984); *accord Schofield,* 793 F.2d at 30. These cases reason that, "if ... section 1962(c) [was construed] to permit the same entity to be both the person and the enterprise, we would reach the anomalous result that the entity was employed by or associated with itself," *DiCaro,* 772 F.2d at 1319, which interpretation "stretches the language too far," *Schofield,* 793 F.2d at 31.

This statutory interpretation also comports with the primary purpose behind RICO, which is to "cope with the infiltration of legitimate businesses." *Turkette,* 452 U.S. at 591, 101 S.Ct. at 2533. The separate and distinct requirement of subsection (c) "reach[es] the criminal but protect[s] the victimized enterprise from liability." *Schofield,* 793 F.2d at 31. It also "'focuses the section on the culpable party and recognizes that the enterprise itself is often a passive instrument or victim of the racketeering activity.'" *Riverwoods Chappaqua Corp.,* 30 F.3d at 344 (citation omitted). Thus, it "'punish[es] the infiltrating criminals rather than the legitimate corporation which might be an innocent victim of the racketeering activity.'" *Brittingham,* 943 F.2d at 300 (quoting *B.F. Hirsch v. Enright Ref. Co.,* 751 F.2d 628, 633–34 (3d Cir.1984)) (citations omitted in original).

We agree with the analysis of the majority of the federal circuits and hold that for the purposes of section 76–10–1603(3), the "person" and "enterprise" must be separate and distinct entities. We, too, would be stretching the interpretation of the language in section 76–10–1603(3) to impose liability on both the culpable person and the enterprise. "The enterprise is mentioned in the section only as the instrument of the person doing the racketeering, and there is no suggestion that the enterprise also may be liable, even if it is a wholly illegitimate operation." *Schofield,* 793 F.2d at 30. Therefore, the issue becomes whether the State presented sufficient evidence at the preliminary hearing to show the existence of an enterprise that was separate and distinct from defendant.

Based on the foregoing analysis, the only entity that would qualify as an enterprise would be Applied Financial Concepts, which was a sole proprietorship. While a sole proprietorship falls within the definition of an enterprise, *see* Utah Code Ann. § 76–10–1602(1) (1995), we must determine whether Applied Financial Concepts was sufficiently separate and distinct from defendant for purposes of section 76–10–1603(3).

■ An individual defendant cannot "be held liable under section 1962(c) if his sole proprietorship were merely a 'one-man

show.'" *DiCaro,* 772 F.2d at 1320 (citation omitted). This is because "it is no less incongruous to find that an individual person can be employed by or associated with himself than it is to find that a corporation can do likewise with itself." *Id.* "[T]he question whether a specific proprietorship is an 'enterprise' distinct from its proprietor depends on the nature, structure, and size of the business." *United States v. Roth,* No. 85 CR 763, 1987 WL 12906, at *3 (N.D.Ill. June 15, 1987).

■ This exact issue was first addressed by the Seventh Circuit in *McCullough v. Suter,* 757 F.2d 142 (7th Cir.1985). There, a section 1962(c) count was brought against a defendant whose sole proprietorship was also the RICO "enterprise" with which the government argued the defendant, as proprietor, "associated." *Id.* at 143; *see generally* 18 U.S.C.A. § 1962(c) (West 1995). Although the defendant was also the sole proprietorship, and therefore, seemingly, the "person" and the "enterprise" were not separate and distinct, the court upheld the RICO count. *See id.* at 144. The court reasoned that "[a] sole proprietorship is a recognized legal entity, and, provided it has any employees, is in any event a 'group of individuals associated in fact.'" *Id.* at 143. Thus, because the defendant had several people working for him, the separate and distinct requirement was met for the purposes of section 1962(c), and the court considered the sole proprietorship an enterprise, not just a "one-man show." *Id.* at 144.

The court carefully differentiated the scenario in which "the sole proprietorship w[as] strictly a one-man show." *Id.*

If [the defendant] had no employees or other associates and simply did business under the name of the National Investment Publishing Company, it could hardly be said that he was associating with an enterprise called the National Investment Publishing Company; you cannot associate with yourself, any more than you can conspire with yourself, just by giving yourself a *nom de guerre.*

*Id.* Under these facts, therefore, the sole proprietorship did not qualify as a RICO enterprise for the purposes of section 1962(c).

Notwithstanding, the court recognized that if the sole proprietor was "all by himself, and yet adopted the corporate form for his activity, he might well fall under section 1962(c), for the corporation would be an enterprise within the meaning of section 1961(4)." *Id.* This was because,

[i]f the one-man band incorporates, it gets some legal protections from the corporate form, such as limited liability; and it is this sort of legal shield for illegal activity that RICO tries to pierce. A one-man band that does not incorporate, that merely operates as a proprietorship, gains no legal protections from the form in which it has chosen to do business; the man and the proprietorship really are the same entity in law and fact. But if the man has employees or associates, the enterprise is distinct from him, and it then makes no difference, so far as we can see, what legal form the enterprise takes. *The only important thing is that it be either formally (as when there is incorporation) or practically (as when there are other people besides the proprietor working in the organization) separable from the individual.*

*Id.* (emphasis added).

The Fifth and Ninth Circuits have expressly adopted the rationale articulated in *McCullough.* The Ninth Circuit stated that McCullough's reasoning "avoids the ontological conundrum of interpreting RICO to make liable an individual who associates with himself or herself, while it maintains at the same time RICO's ability to discourage and punish illegal activity associated with various groups." *United States v. Benny,* 786 F.2d 1410, 1416 (9th Cir.1986).

In *Guidry v. Bank of LaPlace,* 954 F.2d 278 (5th Cir.1992), the facts were somewhat similar to the facts in the case at bar. There, Lynn Paul Martin maintained a bank account at the Bank of LaPlace, a defendant in the case. *See id.* at 280. Martin persuaded investors to give him money to purchase large blocks of airline tickets. *See id.* at 281. Once the tickets were sold, Martin told investors that they would receive their investment back plus a commission. *See id.* At that

time, Martin would give the investors two checks, both of which were post-dated for one month later. *See id.* Martin used funds given to him by later investors to honor the post-dated checks given to the earlier investors. *See id.* The scheme ultimately failed, and the plaintiff lost approximately $5,500,000. *See id.*

Martin operated his scheme through an unincorporated sole proprietorship called LPM Enterprises (LPM). *See id.* An issue on appeal was whether, for purposes of section 1962(c), LPM and Martin were separate and distinct. The court concluded that they were not: "LPM is merely a name under which Martin did business for the purposes of carrying out his scheme." *Id.* at 283. Thus, the court held "the RICO 'person' and 'enterprise' are one and the same, and [the plaintiff's] complaint fails the distinction test." *Id.* Accordingly, the appellate court affirmed the district court's dismissal of the section 1962(c) claims against the defendants.

As in *Guidry,* defendant here was operating Applied Financial Concepts for the purpose of carrying out his fraudulent scheme. There was no evidence that defendant employed any other persons in his business.[8] Therefore, "the man and the proprietorship really are the same entity in law and fact." *McCullough,* 757 F.2d at 144. Of course, Applied Financial Concepts was not a corporate or other "free standing" legal entity that would have brought defendant within the scope of section 76–10–1603(3), even though he operated as a sole proprietorship. *See generally id.* Accordingly, we hold that the magistrate correctly concluded that the State failed to show that an enterprise existed under section 76–10–1603(3) and correctly refused to bind defendant over on the charges brought under this subsection.

**B. Money Laundering**

The State also charged defendant with ten counts of money laundering in violation of section 76–10–1903 of the Utah Code, which provides:

> (1) A person commits the offense of money laundering by financial transaction if, knowing that the property involved in a financial transaction represents proceeds of some form of unlawful activity, he conducts or attempts to conduct a financial transaction which in fact involves the proceeds of specified unlawful activity:
>
> > (a) with intent to promote the carrying on of specified unlawful activity; or
> >
> > (b) knowing that the transaction is designed in whole or in part to:
> >
> > > (i) conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity....

Utah Code Ann. § 76–10–1903 (1995) (repealed and reenacted by 1995 Utah Laws 462, amended 1996).[9]

The relevant portion of the federal money laundering statute, like the RICO statute, is very similar:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> ....
>
> > (B) knowing that the transaction is designed in whole or in part—
> >
> > > (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;
>
> ....

---

8. The State claims that there "may" have been a secretary working for defendant based on the way a certain letter was typed. However, we find this "possibility" insufficient to overcome our conclusion that defendant operated by himself. Even so, it is unlikely that a single employee of a sole proprietorship would or could amount "practically" to an organization separate from the sole proprietor. *See United States v.*

*Yonan,* 622 F.Supp. 721, 724 (D.C.Ill.1985) ("A sole practitioner with only a secretary to assist him ... is [not] magically transformed, by the act of hiring a secretary, into an 'enterprise.'").

9. The State charged defendant with violating both subsection (1)(a) and (1)(b), but has abandoned its argument under subsection (1)(a) for purposes of its petition.

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C.A. § 1956(a)(1)(B)(i) (West Supp. 1997). Accordingly, we look to "federal case law for guidance" on this issue. *Buzas Baseball*, 925 P.2d at 947 n. 5.

To prevail on a section 1956(a)(1)(B)(i) charge, the government must prove that the defendant

"(1) knew the property involved in a financial transaction represented the proceeds of some unlawful activity;

(2) conducted or attempted to conduct a financial transaction which involved the proceeds of unlawful activity; [and,]

(3) knew the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds from the unlawful activity."

*United States v. Dimeck*, 24 F.3d 1239, 1242 (10th Cir.1994) (alteration in original) (quoting *United States v. Levine*, 970 F.2d 681, 686 (10th Cir.1992)); *accord United States v. Reynolds*, 64 F.3d 292, 297 (7th Cir.1995), *cert. denied* 516 U.S. 1138, 116 S.Ct. 969, 133 L.Ed.2d 890 (1996).

■ Neither party here challenges the adequacy of the State's proof of the first two requirements; at issue then is the third requirement, or the "design" element. The magistrate concluded that

there [was] no probable cause to establish that the defendant intentionally concealed the proceeds since no evidence was presented to answer the Court's questions as to the various transactions which transpired between the defendant-controlled accounts and other entities after the deposits of the physicians' proceeds into the defendant-controlled accounts.

The State argues that the magistrate's conclusion was erroneous because sufficient evidence was presented establishing the necessary probable cause that defendant committed the crime of money laundering by intentionally attempting to conceal or disguise the proceeds from his unlawful conduct.

Defendant, however, maintains that the transactions in question were merely "a continuous fraudulent scheme," allowing defendant access to the illegally obtained money.

The money laundering statute is "aimed at transactions that are engaged in for the *purpose* of concealing assets." *United States v. Garcia–Emanuel*, 14 F.3d 1469, 1474 (10th Cir.1994). Therefore, to prove the design element under section 1956(a)(1)(B)(i), the government must show that "the transaction [was] motivated significantly by a desire to create the appearance of legitimate wealth or otherwise to conceal the nature of the funds so that they might enter the economy as legitimate funds." *Dimeck*, 24 F.3d at 1245. The design element requires "substantial proof …; behavior that is merely suspicious but does not evince a design to conceal, as well as 'the mere accumulation of non-concealing behavior,' is not sufficient to sustain a conviction for money laundering." *United States v. Willey*, 57 F.3d 1374, 1384 (5th Cir.) (quoting *Garcia–Emanuel*, 14 F.3d at 1476), *cert. denied*, 516 U.S. 1029, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995). The transaction in question must not be "engaged in for present personal benefit," but must be done for the purpose of "creat[ing] the appearance of legitimate wealth." *Garcia–Emanuel*, 14 F.3d at 1474.

Depositing proceeds from a specified unlawful activity into a business account can constitute the necessary proof of an intent to conceal. *See United States v. Jackson*, 935 F.2d 832, 842 (7th Cir.1991) ("[The] jury could reasonably infer that the [minister/defendant's] use of the church accounts was an attempt to hide the ownership and source of … drug money."); *United States v. Sutera*, 933 F.2d 641, 648 (8th Cir.1991) (holding defendant's use of business account rather than personal account sufficient proof of design to conceal illegal gambling proceeds); *accord Willey*, 57 F.3d at 1385 ("[U]sing a … business entity … to purchase goods on one's behalf or from which one will benefit usually constitutes sufficient proof of a design to conceal."); *Garcia–Emanuel*, 14 F.3d at 1477 (holding design element proven because defendant's use of business to purchase land "create[d] the false impression that the

restaurant was his source of wealth [and] create[d] documentary evidence in support of that deception that could mislead an investigator"). Moreover, transferring illegal proceeds between personal bank accounts was held to amount to sufficient proof of the design element of money laundering. *See United States v. Peery,* 977 F.2d 1230, 1234 (8th Cir.1992) (holding wire transfers between personal accounts sufficient proof of design element).

Here, the magistrate found that defendant initially deposited the funds collected from the doctors into "one or more of the defendant-controlled accounts." Defendant then conducted several transactions between accounts:

> 1) Funds would be withdrawn and deposited in the various defendant-controlled accounts; 2) Funds would be withdrawn from the defendant-controlled accounts and deposited into one or more of the defendant's personal accounts; 3) Funds would be withdrawn from the defendant-controlled accounts and transferred to other entities not controlled by the defendant; or 4) Funds would be deposited into the defendant-controlled accounts from other entities not controlled by the defendant.

While these transactions may not prove beyond a reasonable doubt that defendant was involved in a money laundering scheme, a quantum of evidence exists warranting submission of the money laundering counts to the trier of fact. *See Anderson,* 612 P.2d at 783; *Pledger,* 896 P.2d at 1229. By depositing the funds into the shell business accounts and then later transferring and withdrawing the funds, a reasonable inference exists that defendant intended to conceal or disguise the proceeds from his unlawful conduct. *See generally Pledger,* 896 P.2d at 1229.

■▇▇▇ Defendant argues that because he "was the signatory on the accounts, it is inconceivable that he was trying to conceal or disguise anything by shuffling funds back and forth between those accounts." According to defendant, "[s]uch transfers left an obvious paper trail." Notwithstanding, a conviction under the money laundering statute is not premised upon an intent to conceal or disguise the identity of the parties to the transaction, but "[r]ather, 'the statute is aimed broadly at transactions designed in whole or in part to conceal or disguise *in any manner* the nature, location, source, ownership or control of the proceeds of unlawful activity.'" *Garcia–Emanuel,* 14 F.3d at 1473 (citation omitted). Section 1956(a)(1)(B)(i) focuses "on these characteristics of illegal proceeds because they are characteristics which, when concealed or obliterated, allow illegal proceeds to be passed into commerce as legitimate proceeds more easily." *Dimeck,* 24 F.3d at 1246.

Furthermore, that defendant was clearly listed as the signatory on the accounts is of no consequence. The fact "[t]hat the deception was ultimately unsuccessful, and even that it was relatively easy for investigators to pierce, does not mean that it falls beyond the statute's reach." *Jackson,* 935 F.2d at 842. "[T]he money laundering statute does not require [a finding] that [defendant] did a good job of laundering the proceeds," but only that he intended to conceal the proceeds. *Sutera,* 933 F.2d at 648; *see also Willey,* 57 F.3d at 1386 n. 24 (rejecting defendant's "implicit argument that there could be no design to conceal because each check charged in the money laundering counts listed its true remitter or clearly indicated the account from which it came").

We hold that the magistrate's conclusion that insufficient evidence existed establishing the requisite probable cause that defendant committed the crime of money laundering under section 76–10–1903 is erroneous, and the resulting refusal to bind defendant over on the ten counts of money laundering is also erroneous.

## IV. CONCLUSION

The State presented sufficient evidence to establish the existence of an enterprise under subsections (1) and (2) of section 76–10–1603 of the Utah Code. Therefore, we hold that the magistrate erred in refusing to bind defendant over on the pattern of unlawful activity count under these subsections. Regarding subsection (3) of section 76–10–1603, the magistrate correctly concluded that there was no enterprise and we affirm the magis-

trate's refusal to bind defendant over on the pattern of unlawful activity count under this subsection.

We further hold that the State presented sufficient evidence to establish the requisite probable cause that defendant was involved in a money laundering scheme under section 76–10–1903. Thus, the magistrate erred by refusing to bind defendant over on the ten counts of money laundering.

Therefore, we grant in part the State's Petition for Extraordinary Writ and reverse the magistrate's order regarding the pattern of unlawful activity count as it pertains to subsections (1) and (2) of section 76–10–1603 of the Utah Code. We deny the State's Petition for Extraordinary Writ in part and affirm the magistrate's order regarding subsection (3) of section 76–10–1603. Lastly, we grant the State's Petition for Extraordinary Writ in part and reverse the magistrate's order on the ten counts of money laundering pursuant to section 76–10–1903 of the Utah Code. Accordingly, we remand this case for trial on the appropriate counts.

WILKINS, Associate P.J., and JACKSON, J., concur.