2004 UT App 298

**STATE of Utah, Plaintiff and Appellee,**

v.

**Brooks BRADSHAW, Defendant and Appellant.**

**No. 20020137–CA.**

Court of Appeals of Utah.

Sept. 10, 2004.

Kent R. Hart and Robert K. Heineman, Salt Lake City, for Appellant.

Mark L. Shurtleff, Christine F. Soltis, and Charlene Barlow, Salt Lake City, for Appellee.

Before BILLINGS, P.J., ORME, and THORNE, JJ.

## OPINION

ORME, Judge:

¶1 Defendant Brooks Bradshaw was charged with eleven counts of communications fraud, second degree felonies in violation of Utah Code Ann. § 76–10–1801 (2003), and one count of pattern of unlawful activity (racketeering), a second degree felony in violation of Utah Code Ann. § 76–10–1603 (2003). Bradshaw filed a motion to quash the bindover on the racketeering charge and to reduce the degree of offense of the communications fraud charges. The trial court denied his motion in both respects. We reverse.

## BACKGROUND

¶2 In lieu of a preliminary hearing, which Bradshaw waived, the parties submitted a written stipulation setting forth the following facts. Over a period of several months, Bradshaw defrauded eleven persons of amounts ranging from $400 to $600 each, for a total of $5,400. Most of the victims were either attempting to refinance mortgages on their residences or in the process of foreclosure. After identifying his victims, Bradshaw falsely represented himself as the owner of various mortgage companies. Bradshaw then promised to assist the victims in obtaining refinancing or avoiding foreclosure in exchange for various fees, ostensibly to be used for appraisals, title searches, and credit checks. Brett Kennedy and William Thomas, two of Bradshaw's former coworkers in the appraisal business,[1] witnessed some of the fraudulent activity, and Bradshaw asked Thomas to falsely represent himself as an appraiser to one of the victims. Bradshaw took the victims' money, but never performed any of the promised services. Bradshaw spent the money paying his personal expenses.

¶3 The State charged Bradshaw with eleven counts of communications fraud, second degree felonies in violation of Utah Code Ann. § 76–10–1801 (2003), and one count of pattern of unlawful activity (racketeering), a second degree felony in violation of Utah Code Ann. § 76–10–1603 (2003).[2] Bradshaw filed a motion to quash the bindover on the racketeering charge and to reduce the de-

---

1. Based on complaints unrelated to those at issue in this case, the Department of Commerce had earlier revoked Bradshaw's appraiser's license due to Bradshaw's practice of fraudulently inflating property values.

2. As a convenience to the reader, and because there have been no significant amendments, we cite to the current version of the Utah Code rather than the version in effect when Bradshaw was charged, except as otherwise noted.

gree of offense of the communications fraud charges.

¶ 4 As to the racketeering charge, Bradshaw argued that the State failed to show probable cause that he was engaged in an "enterprise" as required by subsections (1) and (2) of section 76–10–1603. As to the communications fraud charges, Bradshaw argued that the State misconstrued the statute in charging him with eleven second degree felonies. In determining the degree of the offense, the statute allows for aggregation of "the total value of all . . . money . . . obtained by the scheme or artifice." Utah Code Ann. § 76–10–1801(2). In addition, the statute provides that "[e]ach separate communication . . . is a separate act and offense of communication fraud." *Id.* § 76–10–1801(5). The State first aggregated the amount taken from all of Bradshaw's victims, which amounted to $5,400, surpassing the threshold for a second degree felony. *See id.* § 76–10–1801(1)(d). The State then treated each communication as a separate offense and attributed the entire $5,400 to each of Bradshaw's victims, charging Bradshaw with eleven second degree felonies. Bradshaw argued that the State should not be permitted to avail itself of both charging schemes at once. In other words, under Bradshaw's view the State should be required to choose whether to aggregate the amounts taken from Bradshaw's victims, or, in the alternative, to treat each of Bradshaw's communications as separate offenses. Thus, Bradshaw contended that he should have been charged with either eleven class A misdemeanors or one second degree felony.

¶ 5 The trial court denied Bradshaw's motion, concluding, first, that the State could prove the "enterprise" element of racketeering even if Bradshaw only used the money for personal expenses, and second, that the State could legitimately charge Bradshaw with eleven second degree felonies under section 76–10–1801.

¶ 6 Pursuant to a plea agreement, Bradshaw pled guilty to four counts of attempted communications fraud, third degree felonies under Utah Code Ann. § 76–4–102(3) (2003), reserving his right to appeal the trial court's denial of his motion. *See generally State v. Sery,* 758 P.2d 935, 939 (Utah Ct.App.1988). The trial court accepted the pleas and the remaining charges were dropped. A judgment of conviction was entered on four counts of attempted communications fraud, and Bradshaw appealed.

## ISSUES AND STANDARDS OF REVIEW

¶ 7 Bradshaw raises two issues on appeal. First, Bradshaw argues that the State's charging scheme is contrary to the language and purpose of Utah's Communications Fraud statute. Second, Bradshaw argues that the trial court erroneously denied his motion to quash the bindover on the racketeering charge because the stipulated facts do not establish that Bradshaw was engaged in an "enterprise."

¶ 8 Both issues on appeal present questions of statutory interpretation. "The proper interpretation of a statute is a question of law." *Rushton v. Salt Lake County,* 1999 UT 36, ¶ 17, 977 P.2d 1201. Therefore, "we accord no deference to the legal conclusions of the [trial] court but review them for correctness." *Id.* Likewise, "[t]he determination of whether to bind a criminal defendant over for trial is a question of law. . . . [W]e review that determination without deference to the court below." *State v. Clark,* 2001 UT 9, ¶ 8, 20 P.3d 300.[3]

---

3. The dissenting opinion, in its footnote 1, relies on *Clark,* among other cases, in criticizing "the bindover standard applied by the majority." Specifically, the dissent discusses at some length the notion that at a preliminary hearing, " ' "the magistrate must view all evidence in the light most favorable to the prosecution and must draw all reasonable inferences in favor of the prosecution." ' " *Clark,* 2001 UT 9 at ¶ 10, 20 P.3d 300 (citations omitted). Ordinarily in reviewing bindover determinations, "we are," as stated by the dissent "required to draw *all* reasonable evidentiary inferences in the state's favor."

The problem in this case—and it is rather unique in our experience—is that there was no preliminary hearing and there was no evidence introduced from which inferences may be drawn. Instead, the State agreed to submit a written stipulation of facts on the basis of which the propriety of the charges was to be evaluated. While this procedure no doubt saved the State the trouble of calling witnesses and presenting evidence, the decision to bind Bradshaw over

## ANALYSIS

### I. Rules of Statutory Interpretation

¶ 9 "When interpreting statutes, our primary goal is to evince 'the true intent and purpose of the Legislature.' " *State ex rel. Division of Forestry, Fire & State Lands v. Tooele Co.,* 2002 UT 8, ¶ 10, 44 P.3d 680 (quoting *Jensen v. Intermountain Health Care, Inc.,* 679 P.2d 903, 906 (Utah 1984)). Generally, the " 'best evidence' of a statute's meaning [is] the plain language of the act." *Id.* "In reading the language of an act, moreover, we seek 'to render all parts [of the statute] relevant and meaningful,' and we therefore 'presume the legislature use[d] each term advisedly and ... according to its ordinary meaning.' " *Id.* (alterations and ellipsis in original) (citations omitted). This means that "the expression of one [term] should be interpreted as the exclusion of another ... [and that] omissions in statutory language should 'be taken note of and given effect.' " *Biddle v. Washington Terrace City,* 1999 UT 110, ¶ 14, 993 P.2d 875 (quoting *Kennecott Copper Corp. v. Anderson,* 30 Utah 2d 102, 514 P.2d 217, 219 (1973)).

¶ 10 However, if the plain language of a statute is ambiguous, "unreasonably confused, [or] inoperable," we will "seek guidance" from other sources, including "legislative history and relevant policy considerations." *State Farm Mut. Auto. Ins. Co. v. Clyde,* 920 P.2d 1183, 1186 (Utah 1996) (internal quotations and citations omitted). Finally, "[Utah statutory] provisions and all proceedings under them are to be liberally construed with a view to effect the objects of the statutes and to promote justice." Utah Code Ann. § 68–3–2 (2000).

### II. Communications Fraud

¶ 11 Bradshaw argues that the State should not be permitted to aggregate the amounts taken from all of his victims while simultaneously treating each communication as a separate offense, thereby attributing the

aggregated amount of $5,400 to each of Bradshaw's eleven victims.

¶ 12 Pursuant to the rules of statutory construction outlined above, we look first to the language of the statute. The relevant provisions of Utah's Communications Fraud statute are as follows:

(1) Any person who has devised any scheme or artifice to defraud another or to obtain from another money, property, or anything of value by means of false or fraudulent pretenses, representations, promises, or material omissions, and who communicates directly or indirectly with any person by any means for the purpose of executing or concealing the scheme or artifice is guilty of:

    (a) a class B misdemeanor when the value of the property, money or thing obtained or sought to be obtained is less than $300;

    (b) a class A misdemeanor when the value of the property, money, or thing obtained or sought to be obtained is or exceeds $300 but is less than $1,000;

    (c) a third degree felony when the value of the property, money, or thing obtained or sought to be obtained is or exceeds $1,000 but is less than $5,000;

    (d) a second degree felony when the value of the property, money, or thing obtained or sought to be obtained is or exceeds $5,000....

(2) The determination of the degree of any offense under Subsection (1) shall be measured by the total value of all property, money, or things obtained or sought to be obtained by the scheme or artifice described in Subsection (1)....

    . . . .

(5) Each separate communication made for the purpose of executing or concealing a scheme or artifice described in Subsection

---

must be evaluated with reference to the facts recited within the four corners of the stipulation. Having forgone the option of presenting evidence, the State is necessarily not in a position to benefit from evidentiary inferences. The State

opted for the peculiar procedure employed in this case, and it is not entitled to be rescued from the factual limitations resulting from its reliance on a written stipulation instead of evidence presented at a normal preliminary hearing.

(1) is a separate act and offense of communication fraud.

Utah Code Ann. § 76–10–1801 (2003).

¶ 13 In the trial court's view, the validity of the State's charging methodology hinged on the interpretation of the word "another" in subsection (1) of section 76–10–1801, which refers to "any scheme or artifice to defraud *another* or to obtain [money] from *another* . . . by means of false or fraudulent pretenses." *Id.* (emphasis added). The trial court reasoned that if "another" is interpreted in the singular, a "scheme or artifice" would appear to contemplate only one victim; but, on the other hand, if "another" is interpreted to include the plural, then "scheme or artifice" could involve multiple victims.

¶ 14 The trial court concluded that the term "another" should be interpreted to include the plural form "others" and thus that the term "scheme or artifice" could include multiple victims. Consequently, the trial court concluded that the defrauding of all eleven of Bradshaw's victims must be treated as a single scheme or artifice under the statute.

■ ¶ 15 The trial court's interpretation of the statute was erroneous. While it is generally true that "[t]he singular number includes the plural, and the plural the singular," Utah Code Ann. § 68–3–12(1)(a) (2000), the opposite is true when "such construction would be inconsistent with the manifest intent of the Legislature or repugnant to the context of the statute[.]" *Id.* § 68–3–12(1). *See also Metropolitan Water Dist. v. Salt Lake City,* 14 Utah 2d 171, 380 P.2d 721, 724 (1963) ("[I]t is quite generally held that *where a*

*sensible interpretation and application of the statute so requires* the singular includes the plural and vice versa.") (emphasis added).

¶ 16 The language of the statute indicates that the "aggregation" and "separate offense" provisions apply only to a single scheme or artifice. Thus, in order to uphold the trial court, subsection (2) permits aggregation of the total value of money "obtained . . . by the *scheme or artifice* described in Subsection (1)," Utah Code Ann. § 76–10–1801(2) (2003) (emphasis added), while subsection (5) permits "[e]ach separate communication made for the purpose of executing or concealing a *scheme or artifice* described in Subsection (1)" to be treated as separate offenses. *Id.* § 76–10–1801(5) (emphasis added). *See State ex rel. Division of Forestry, Fire & State Lands v. Tooele Co.,* 2002 UT 8,¶ 10, 44 P.3d 680 (We " 'presume the legislature use[d] each term advisedly and . . . according to its ordinary meaning.' ") (alteration and ellipsis in original) (citation omitted). Thus, even if "another" as used in subsection (1) should be deemed to mean "another or others,"[4] the "others" would have to be defrauded by means of a single scheme or artifice.[5]

¶ 17 The United States Supreme Court recognized that the word "scheme" is "highly elastic" and "hardly a self-defining term." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 241 n. 3, 109 S.Ct. 2893, 2901 n. 3, 106 L.Ed.2d 195 (1989). Rather, "[a] 'scheme' is in the eye of the beholder, since whether a scheme exists depends on the level of generality at which criminal activity is viewed." *Id.* Indeed, the State acknowledges in this case that Utah trial courts have

---

4. When the Legislature wished to be clear that it intended multiple—rather than singular—implications, it was able to say so quite clearly. Thus, in subsection (5), it clearly stated that if multiple communications are made, even if in furtherance of a single scheme or artifice, "[e]ach separate communication" constitutes a distinct communications fraud offense. Utah Code Ann. § 76–10–1801(5) (2003).

5. Selectively adhering to the notion that the "singular includes the plural," the State agrees with the trial court that "another" as used in subsection (1) should be construed to mean "another *or others* " and thus that the losses of multiple victims of a single scheme can be aggregated. In

contrast, the trial court did not suggest, and the State does not argue on appeal, that the term "scheme or artifice" as used in subsections (1), (2), and (5) is similarly intended to mean "scheme *or schemes* or artifice *or artifices* " rather than a single "scheme or artifice." Perhaps the State is merely reserving this argument for a case where such a view would allow it to apply the aggregation and "separate offense" provisions to a criminal defendant who, for example, perpetrates a stock fraud, a real estate swindle, and a pyramid scheme all in the same general time period. There is no obvious bar to such an approach if the singular invariably includes the plural.

"go[ne] both ways" in interpreting section 76–10–1603. *See* 2A Norman J. Singer, Statutes and Statutory Construction § 45:02, at 17 (6th ed. 2000) ("[L]egislation is ambiguous ... when well-informed persons may reasonably disagree as to its meaning.").

■ ¶ 18 However, the United States Supreme Court has directed that " 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.' " *Simpson v. United States,* 435 U.S. 6, 14, 98 S.Ct. 909, 914, 55 L.Ed.2d 70 (1978) (quoting *United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971)). *Accord United States v. Turkette,* 452 U.S. 576, 587 n. 10, 101 S.Ct. 2524, 2531 n. 10, 69 L.Ed.2d 246 (1981) (recognizing that the "rule of lenity," as a "guide to statutory construction ... serves as an aid for resolving an ambiguity"). Thus, " '[w]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when [the Legislature] has spoken in clear and definite language.' " *Scheidler v. NOW, Inc.,* 537 U.S. 393, 123 S.Ct. 1057, 1068, 154 L.Ed.2d 991 (2003) (quoting *McNally v. United States,* 483 U.S. 350, 359–60, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987)). Utah courts have also recognized the concept of lenity. *See State v. Barker,* 624 P.2d 694, 696 (Utah 1981) ("[It is] the presupposition of our law to resolve doubts in the enforcement of the penal code against the imposition of a harsher punishment.").

¶ 19 In addition, "relevant policy considerations" may be taken into account in construing an ambiguous statute. *State Farm Mut. Auto. Ins. Co. v. Clyde,* 920 P.2d 1183, 1186 (Utah 1996) (internal quotations and citations omitted). As Bradshaw points out in his brief, charging him with eleven second degree felonies, each carrying a prison sentence of one to fifteen years, *see* Utah Code Ann. § 76–3–203(2) (1999),[6] subjects him to as much as a 165–year prison term for taking a total of $5,400 because he took it from eleven people. Such a charging system is repugnant to notions of traditional fairness and, additionally, does not comport with a stated purpose of the Utah Criminal Code, which is to "[p]rescribe penalties which are proportionate to the seriousness of offenses." Utah Code Ann. § 76–1–104(3) (2003). *See also* Utah Code Ann. § 76–1–106 (2003) ("All provisions of this code and offenses defined by the laws of this state shall be construed according to the fair import of their terms to promote justice and to effect the objects of the law and general purposes of [the Utah Criminal Code.]"); 2A Norman J. Singer, Statutes and Statutory Construction § 45:12, at 81–82 (6th ed. 2000) ("It [is] a golden rule of statutory interpretation that, when one of several possible interpretations produces an unreasonable result, that is a reason for rejecting that interpretation in favor of another which would produce a reasonable result.").

■ ¶ 20 In the instant case, the stipulation establishes multiple schemes, not a single scheme with multiple victims. *See supra* note 5. The victims were deceived at different times, in different places, by different stories, and through different methods. The victims were approached in different cities, including Salt Lake City, West Jordan, South Jordan, Tooele, and Draper. The victims were also promised different combinations of services, including title searches, credit reports, and property appraisals. Only some of the victims were facing imminent foreclosure. Although most of the victims were interested in refinancing their residences, Bradshaw offered to arrange the purchase of one victim's store and offered to help another victim with a "real estate project he was attempting to complete." On some of the occasions, Bradshaw was accompanied by at least one former coworker. Bradshaw approached some of the victims as couples and other times approached them individually. The State attempts to generalize this series of schemes into a single scheme. *See H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 241 n. 3, 109 S.Ct. 2893, 2901 n. 3, 106 L.Ed.2d 195 (1989) ("[W]hether a scheme exists depends on the level of generality at which criminal activity is viewed."). However, such disparate circumstances simply can-

---

**6.** Although section 76–3–203 has recently been amended, this particular provision remains un-changed. *See* Utah Code Ann. § 76–3–203(2) (2003).

not fairly be characterized as one "scheme or artifice" under section 76–10–1603.[7]

■ ¶ 21 The State argues that "it is the prerogative of the legislature to define crimes and punishments" and that it "may impose harsher penalties on certain crimes even if logic does not compel them to do so." The point is well made. However, in this case, the Legislature's obvious policy to "get tough" on communications fraud is aptly served under the interpretation of section 76–10–1801 embraced here. As previously noted, the statute allows the State to treat each communication in furtherance of a scheme or artifice as a separate offense and may, in appropriate cases, allow the State to aggregate money taken from each individual victim of a single, coherent scheme for purposes of making the crimes second degree felonies—stern enforcement by any standard. Absent explicit direction from the Legislature, however, we will not read the statute as additionally allowing the State to attribute the losses from each victim of *multiple* schemes to all other victims. *See Jensen v. Intermountain Health Care, Inc.*, 679 P.2d 903, 906–07 (Utah 1984) ("The meaning of a part of an act should harmonize with the purpose of the whole act.... The Legislature can hardly have intended that a construction should be placed on [one section] that would result in harsh and unfair results in applying the remainder of the Act."). As stated by our Supreme Court:

> It is not always possible to foresee and prescribe ... all situations to which [a statute] might apply. Attempts to give [a statute] universal and literal application frequently lead to incongruous results which were never intended. When it is

obvious that this is so, the statute should ... be considered in the light of its background and ... purpose[,] together with other aspects of the law which have a bearing on the problem involved.

*Snyder v. Clune*, 15 Utah 2d 254, 390 P.2d 915, 916 (1964).

¶ 22 In light of the language and relevant policy underlying Utah's Communications Fraud statute, the State may not attribute the aggregated amount of $5,400 to each individual victim of Bradshaw's entire course of fraudulent activity. Therefore, at least on the basis of the facts stipulated to by the State, Bradshaw's motion to reduce the degree of the charged offenses on the communications fraud counts should have been granted.

## III. Racketeering

■ ¶ 23 Bradshaw argues that the State failed to establish probable cause that he was engaged in an "enterprise" as required by Utah's Pattern of Unlawful Activity Act (UPUAA). *See* Utah Code Ann. § 76–10–1603(1), (2) (2003). Bradshaw is correct that "[t]o bind a defendant over for trial, the State must show 'probable cause' at a preliminary hearing" by producing evidence sufficient "to support a reasonable belief that an offense has been committed and that the defendant committed it."[8] *State v. Clark*, 2001 UT 9,¶¶ 10,16, 20 P.3d 300 (citations omitted). *Accord State v. Robinson*, 2003 UT App 1,¶ 5, 63 P.3d 105. This means that the State must produce " 'believable evidence of all the elements of the crime charged,' " *Clark*, 2001 UT 9 at ¶ 15, 20 P.3d 300 (citations omitted), i.e., "that (1) [Brad-

---

7.  In contrast, a single scheme with multiple victims would likely be established by the facts of the following scenario. Suppose that a defendant holds an "investment seminar" at a retirement home, where he gathers a dozen residents together, presents a slide show, and distributes brochures, etc., falsely detailing the financial rewards of a nonexistent "investment opportunity." The defendant then gathers $1,000 checks from each of the residents attending the seminar. While the investment scam just described involved more than one victim, we think it could nevertheless be characterized as one "scheme" under section 76–10–1603. Although involving multiple victims, the circumstances in such a

scenario suggest a single scheme: each victim was deceived at the same time, in the same place, and with the same fraudulent representations as all the other victims.

8.  As previously noted, for better or worse the parties stipulated to the pertinent facts in lieu of a preliminary hearing. In the absence of a preliminary hearing, and in light of the fact that the parties anticipated and invited the court to rule on Bradshaw's motion to quash the bindover based on the stipulated facts, the State was required to satisfy its probable cause burden via the stipulation. *See supra* note 3.

shaw was] engaged in a pattern of unlawful activity and (2) [Bradshaw was] involved in an enterprise." *Holbrook v. Master Prot. Corp.*, 883 P.2d 295, 302 (Utah Ct.App.1994). *Accord State v. McGrath*, 749 P.2d 631, 636 (1988) (holding State must prove both elements to prevail on racketeering charge).

¶ 24 Bradshaw essentially concedes that the State demonstrated the required probable cause on the "pattern of unlawful activity" element of racketeering. Therefore, we address only the second prong of the racketeering charge, i.e., whether the stipulation contained facts showing that Bradshaw was involved in an "enterprise" as required by subsections (1) and (2) of section 76–10–1603.[9] It clearly did not.

¶ 25 While the stipulation ably detailed the facts relative to the communications fraud charges, allowing for meaningful evaluation of those counts, it all but ignored the racketeering count. Neither the criminal information nor the stipulated facts set forth any cognizable theory of an enterprise. This approach was rejected in *State v. Bell*, 770 P.2d 100 (Utah 1988),[10] where the Utah Supreme Court explained that "[t]he existence of an 'enterprise' is essential for the crimes defined by [UPUAA]" because the UPUAA crime "is more than just the substantive offense constituting the racketeering activity; it consists of a particular relationship between the racketeering activity and an enterprise.... Thus, proof of the existence of an enterprise and its relationship to the racketeering activity is essential for a conviction under [UPUAA]." *Id.* at 103 n. 2. *See also Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645–46 (7th Cir.1995) (dismissing RICO complaint because "a nebulous, open-ended description of the enterprise does not sufficiently identify this essential element of the RICO offense");

9. Those subsections provide:

> (1) It is unlawful for any person who has received any proceeds derived, whether directly or indirectly, from a pattern of unlawful activity in which the person has participated as a principal, to use or invest, directly or indirectly, any part of that income, or the proceeds of the income, or the proceeds derived from the investment or use of those proceeds, in the acquisition of any interest in, or the establishment or operation of, any enterprise.
>
> (2) It is unlawful for any person through a pattern of unlawful activity to acquire or maintain, directly or indirectly, any interest in or control of any enterprise.

Utah Code Ann. § 76–10–1603 (2003). Because UPUAA was modeled after, and its provisions are nearly identical to, the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), "we look to ... federal case law for guidance on these issues." *Buzas Baseball, Inc. v. Salt Lake Trappers, Inc.*, 925 P.2d 941, 947 n. 5 (Utah 1996). *See also State v. Bell*, 770 P.2d 100, 101 n. 1 (Utah 1988) ("The Utah Act and similar provisions in other states have been referred to as 'Little RICO' Acts because they were modeled after the federal 'RICO' statute[.]").

The RICO analogs to subsections (1) and (2) of UPUAA provide:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation

of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce....

> (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C.A. § 1962 (West 2000).

As defined in UPUAA, " '[e]nterprise' means any individual, sole proprietorship, partnership, corporation, business trust, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, and includes illicit as well as licit entities." Utah Code Ann. § 76–10–1602(1) (1999).

The RICO definition of "enterprise" is almost identical to its UPUAA counterpart, and provides: " '[E]nterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C.A. § 1961(4) (West 2000).

10. Several of the cases referred to in this opinion were decided under Utah's former antiracketeering statute, known as the "Racketeering Influences and Criminal Enterprise Act," or "RICE." *See State v. Thompson*, 751 P.2d 805, 815 n. 3 (Utah Ct.App.1988) (noting that RICE was amended in 1987 and renamed the "Pattern of Unlawful Activity Act"), *rev'd on other grounds*, 810 P.2d 415 (Utah 1991). The provisions at issue in the instant case are substantially the same as they were under RICE, and thus the authority cited that refers to RICE applies with equal force here.

*Gore v. Eichholz,* No. CV–491–084, 1992 WL 96316, *2, 1992 U.S. Dist. LEXIS 5998, at **7, 18 (S.D.Ga. April 24, 1992) (dismissing RICO claim where complaint failed to "identify [an] enterprise precisely, describe its structure, or explain the [d]efendants' role in the pattern of racketeering activity associated with the enterprise").

¶ 26 The facts of *Bell* are illustrative. In that case, the defendant, who owned a convenience store, was convicted of racketeering "by means of drug trafficking" in his store. *Bell,* 770 P.2d at 101. The defendant appealed, claiming that the State's bill of particulars "was not adequately detailed to put him on notice of the alleged factual basis for the element of an enterprise." *Id.* at 105. Regarding the enterprise element, the State's bill of particulars recited: "[The e]nterprise consists of the trafficking [sic] in controlled substances and investing the proceeds." *Id.* (second alteration in original). The Court responded: "By no stretch of the imagination could th[is] single enigmatic sentence . . . be construed as containing sufficient factual information to describe the State's actual theories of [the enterprise] element of the crime, much less to permit [defendant] to prepare his defense on this element." *Id.* Thus, the Court reversed the defendant's convictions and remanded for a new trial. *See id.* at 111.

¶ 27 While admittedly in a different procedural posture than the instant case,[11] the Court's observations in *Bell* are applicable here. The State's information merely parrots the language of UPUAA and offers no insight into the State's theory of the alleged enterprise. Likewise, the stipulation nowhere mentions the word "enterprise." On appeal, the State postulates that its theory of an enterprise is an "association in fact" between Bradshaw and his two former co-workers. An "association in fact" enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence

that the various associates function as a continuing unit." *State v. Hutchings,* 950 P.2d 425, 431 (Utah Ct.App.1997). The stipulation's vague references to the fact that two of Bradshaw's acquaintances witnessed some of the misrepresentations and may have participated on one occasion is not suggestive of an "ongoing organization" or that Bradshaw and his so-called accomplices "function[ed] as a continuing unit." *Id. See Clark,* 2001 UT 9 at ¶ 15, 20 P.3d 300 (holding that to satisfy probable cause standard at preliminary hearing, State must produce " 'believable evidence of all the elements of the crime charged' ") (citations omitted). *See also State v. Rael,* 127 N.M. 347, 981 P.2d 280, 284 (Ct.App.1999) ("Sporadic, temporary criminal alliances do not constitute an enterprise within the meaning of the [state RICO] act."), *cert. denied,* 127 N.M. 390, 981 P.2d 1208 (1999). *Cf., e.g., United States v. Phillips,* 239 F.3d 829, 844 (7th Cir.) (affirming the existence of an enterprise when detailed evidence showed "a long-established street gang" that was "involved in the sale of illegal drugs" and was "an ongoing organization with members who functioned as a continuing unit" with "a definite structure with a distinct ranking of members"), *cert. denied,* 534 U.S. 884, 122 S.Ct. 191, 151 L.Ed.2d 134 (2001); *State v. McGrath,* 749 P.2d 631, 637 (Utah 1988) (finding sufficient evidence to support the existence of an enterprise where defendant and accomplice "had an ongoing association in fact for the purpose of making money from the sale of controlled substances"; "[d]efendant regularly 'fronted' drugs to [his accomplice], who in turn sold them to individual users"; and defendant and his accomplice "ke[pt] written accounts of their numerous transactions . . . [which] showed seventy-four transactions between [the two]").

¶ 28 Likewise, the State misunderstands UPUAA insofar as it suggests it need

---

11. The State is done no disservice here by analogizing to *Bell.* The Court in *Bell* was called upon to decide whether the defendant was "given sufficiently detailed notice of the charges against him to enable him to prepare a defense," *Bell,* 770 P.2d at 101, whereas here we must determine whether the State set forth in the stipulation sufficient facts to support a reasonable belief

that Bradshaw was engaged in an enterprise. *See State v. Clark,* 2001 UT 9,¶¶ 10,16, 20 P.3d 300. If vague, summary allegations regarding the existence of an enterprise are insufficient to put a defendant on notice of the charges against him, they are necessarily insufficient to meet the higher threshold of probable cause.

only point to the existence of an "individual" to satisfy the "enterprise" element. It is true that a criminal defendant *may be* both an "individual" [12] and an "enterprise" under subsections (1) and (2) of section 76–10–1602. *See State v. Hutchings*, 950 P.2d at 433, 435 (holding that " 'the liable "person" and the "enterprise" can be the same entity' " under subsections (1) and (2) of section 76–10–1603) (quoting *United States v. DiCaro*, 772 F.2d 1314, 1320 (7th Cir.1985), *cert. denied*, 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 716 (1986)). However, the State cites no authority suggesting that a criminal defendant's status as an "individual," without more, establishes a violation of UPUAA. *See Bell*, 770 P.2d at 103 n. 2 ("An enterprise may consist of an individual, corporation, *or other business entity*, or any de facto association, and may be either a legal or an illicit entity.") (emphasis added). Because most criminal defendants are also "individuals," the State's apparent view would essentially collapse the "enterprise" and "pattern of unlawful activity" elements into one and would extend the scope of antiracketeering laws to virtually all substantive criminal offenses. Courts have universally rejected such efforts "to dress a garden-variety fraud and deceit case in RICO clothing." *Condict v. Condict*, 826 F.2d 923, 929 (10th Cir.1987).[13]

¶ 29 The stipulation submitted in this case suffers from an additional fatal defect in that it fails to include any facts suggesting Bradshaw used the proceeds from his fraudulent activity to invest or gain an interest in an enterprise as required by section 76–10–1603(1). Instead, the stipulation states that Bradshaw used the money to pay his "personal bills." [14] The trial court nevertheless deemed the stipulation sufficient in this respect, finding that, as a matter of law, using the proceeds from a pattern of unlawful activity to pay one's personal bills "qualif[ies] as] racketeering." [15] We disagree.

12. "The RICO person in a civil or criminal RICO action is the defendant." *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir.1995). A "person" under UPUAA is "any individual or entity capable of holding a legal or beneficial interest in property[.]" Utah Code Ann. § 76–10–1602(3) (1999). *Accord* 18 U.S.C.A. § 1961(3) (West 2000) (A " 'person' includes any individual or entity capable of holding a legal or beneficial interest in property[.]").

13. In *State v. McGrath*, 749 P.2d 631 (Utah 1988), the Utah Supreme Court explained: "To avoid running afoul of constitutional prohibitions against double jeopardy, the federal courts have held under the federal [RICO] Act that the government must prove at least one element beyond the pattern of racketeering activity. That additional element is the existence of an 'enterprise.' " *Id.* at 636.

Similarly, the United States Supreme Court stated:

That a wholly criminal enterprise comes within the ambit of the statute does not mean that a "pattern of racketeering activity" is an "enterprise." In order to secure a conviction under RICO, the Government must prove, both the existence of an "enterprise" and the connected "pattern of racketeering activity.".... While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. *The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.*

*United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981) (emphasis added). *See also Ouaknine v. MacFarlane*, 897 F.2d 75, 82 (2d Cir.1990) ("Under the plain language of [RICO] ... the violation is not established by mere participation in predicate acts of racketeering."); *State v. Thompson*, 751 P.2d 805, 816 (Utah Ct.App.1988) ("[UPUAA] does not simply punish multiple violations of statutes prohibiting the acts enumerated in section 76–10–1602(1). Instead, [UPUAA] punishes participation in a pattern of racketeering activity bearing the required relationship to an enterprise.").

14. Recognizing that the stipulation is deficient in this respect, the State urges us on appeal to "assume that some of [Bradshaw's personal] bills covered defendant's vehicle expenses in traveling and telephone expenses in contacting the various victims." We decline to make this assumption. *See generally Rivera v. State Farm Mut. Auto. Ins. Co.*, 2000 UT 36,¶ 11, 1 P.3d 539 ("A stipulation ... 'may not be disregarded or set aside at will.' ") (citation omitted); *supra* note 3.

15. The dialogue that took place between Bradshaw's counsel and the trial court at the hearing on Bradshaw's motion to quash the bindover is illustrative:

DEFENSE COUNSEL: It's my contention that in order to meet the elements of [UPUAA], [the State has] to show [the proceeds were] invested somehow towards furthering the scheme; so him using the proceeds for himself, to buy himself some Star[b]ucks Coffee or take himself to the movie or put gas in his car for whatever purpose, wouldn't meet that. If he

¶ 30 The language of UPUAA is clear that the defendant must "use or invest" the proceeds from the unlawful activity in the proscribed manner, namely the "acquisition," "establishment," or "operation of" an "enterprise." Utah Code Ann. § 76–10–1603(1). *See Bell,* 770 P.2d at 103 n. 2 ("[UPUAA] makes it a crime to use the profits of racketeering activity to acquire or maintain an interest in an enterprise."). *Accord Hutchings,* 950 P.2d at 430 (" 'A [RICO] violation occurs not when the defendant engages in the predicate acts, but only when he uses or invests the proceeds of that activity in an enterprise.' ") (citation omitted).

¶ 31 Similarly, in *Grider v. Texas Oil & Gas Corp.,* 868 F.2d 1147 (10th Cir.), *cert. denied,* 493 U.S. 820, 110 S.Ct. 76, 107 L.Ed.2d 43 (1989), the court stated: "Significantly, the [RICO] statute does not state that it is unlawful to *receive* racketeering income; rather, as the . . . language underscores, the statute prohibits a person who *has received* such income *from using or investing it* in the proscribed manner." *Id.* at 1149 (emphasis in original). Thus, in federal RICO prosecutions, showing that the defendant used the fraudulently obtained income in the proscribed manner is part of the government's prima facie case. *See Vicom, Inc. v. Harbridge Merch. Servs., Inc.,* 20 F.3d 771, 778 (7th Cir.1994) ("A [RICO] violation . . . requires 'the receipt of income from a pattern of racketeering activity, and the use of that income in the operation of an enterprise.' ") (citation omitted); *United States v. Cauble,* 706 F.2d 1322, 1331 (5th Cir.1983) ("The government establishes a [RICO] violation by proving the existence of an enterprise, the defendant's derivation of income from a pattern of racketeering activity, and the use of any part of that income in acquiring an interest in or operating the enterprise."), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984); *Allen v. New World Coffee, Inc.,* No. 00 Civ. 2610(AGS), 2002 WL 432685, *4, 2002 U.S. Dist. LEXIS 4624, at **8 (S.D.N.Y.2002) ("The 'essence of a [RICO] violation . . . is not commission of predicate acts but investment of racketeering income.' ") (quoting *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1063 (2d Cir.1996), *rev'd on other grounds,* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998)); [16] *Barker v. E.F. Hutton & Co.,* No. C–89–1840 EFL, 1990 WL 257283, *2, 1990 U.S. Dist. LEXIS 19039, at *6 (N.D.Cal. July 6, 1990) (holding that "section 1962(a) is not violated . . . where the RICO defendant merely profits from a pattern of racketeering activity but does not otherwise invest this money in a RICO enterprise").

¶ 32 Like its RICO cousin, UPUAA is a fairly intricate criminal statute, and the stipulation in this case, focused as it was on facts pertinent to other crimes, i.e., to "a garden-variety fraud and deceit case," *Condict v. Condict,* 826 F.2d 923, 929 (10th Cir.1987), is wholly insufficient to demonstrate probable cause to support a bindover on the racketeering charge. *See Dempsey v. Sanders,* 132 F.Supp.2d 222, 226 (S.D.N.Y.2001) (" '[Because the RICO statute] is an unusually potent weapon—the litigation equivalent of a thermonuclear device . . . courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb.' ") (quoting *Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 346 (S.D.N.Y.1998)); *State v. Huynh,* 519 N.W.2d 191, 195 (Minn.1994) ("Clearly, our statute is not limited to drug 'kingpins' or major crime syndicates, but nei-

uses the proceeds to print out business cards to help further his communication fraud scheme, arguably, that would.... I don't believe the State has any evidence that these were used for anything other than him and his just normal living expenses.
THE COURT: Well, and that's what I'm—I'm finding, that I respectfully disagree; that using the proceeds for himself, if you will, or not towards furthering the scheme does qualify under that element in the racketeering.

16. The federal RICO statute "creates a civil cause of action under section 1964(c) against those injured by violations of section 1962(a)-(d)." *Delta Truck & Tractor, Inc. v. J.I. Case Co.,* 855 F.2d 241, 242 n. 1 (5th Cir.1988), *cert. denied,* 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989). Since " 'Congress . . . intended civil RICO plaintiffs to prove the same elements which the Government must prove in a criminal case,' " *Slattery v. Costello,* 586 F.Supp. 162, 164 (D.D.C.1983) (citation omitted), civil RICO cases are illustrative of the required elements for a prima facie case of racketeering.

ther do we think our Act is intended to make a racketeer out of every criminal offender.").

## CONCLUSION

¶ 33 Pursuant to the language and policy underlying Utah's Communications Fraud statute, the State should not be permitted to attribute the aggregated amount of $5,400 to each individual victim of each scheme perpetrated by Bradshaw in the course of his fraudulent activity. Additionally, the State failed to demonstrate probable cause that Bradshaw was engaged in an "enterprise" as required by subsections (1) and (2) of section 76–10–1603. Accordingly, the trial court's order is reversed and the case remanded with instructions to grant Bradshaw's motion to reduce the degree of the charged offenses on the communications fraud counts and to quash the racketeering charge against him, and for such other proceedings as may now be appropriate.

¶ 34 I CONCUR: JUDITH M. BILLINGS, Presiding Judge.

1. In 2001, the Utah Supreme Court clarified the quantum of evidence necessary to bind a defendant over on charges. *See State v. Clark,* 2001 UT 9, ¶¶ 10–16, 20 P.3d 300. After discussing the existing precedent, which was the source of a great deal of confusion, the court formulated the following standard as the standard applicable to all bindover challenges:

   To bind a defendant over for trial, the State must show "probable cause" at a preliminary hearing by "present[ing] sufficient evidence to establish that the 'crime charged has been committed and that the defendant has committed it.' " At this stage of the proceeding, "the evidence required [to show probable cause] . . . is relatively low because the assumption is that the prosecution's case will only get stronger as the investigation continues." Accordingly, "[w]hen faced with conflicting evidence, the magistrate may not sift or weigh the evidence . . . but must leave those tasks 'to the fact finder at trial.' " Instead, "[t]he magistrate must view all evidence in the light most favorable to the prosecution and must draw all reasonable inferences in favor of the prosecution."

   *Id.* at ¶ 10 (alterations in original) (citations omitted).

   The supreme court further stated that there exists "no principled basis . . . to maintain a distinction between the arrest warrant probable cause standard and the preliminary hearing probable cause standard." *Id.* at ¶ 16. Consequently, if the State presents the court with sufficient information to issue an arrest warrant, a

THORNE, Judge (dissenting): ·

¶ 35 I respectfully dissent. First, although I agree that the racketeering charge presents a close question, I disagree with the majority's conclusion. In short, the State's evidence—when all reasonable inferences are drawn in the State's favor—establishes sufficient probable cause to support the charge at this stage of the proceeding. Similarly, when the communications fraud charges are analyzed with the proper deference, and in light of the statute's plain language, this court should conclude that the trial court acted properly in denying Bradshaw's motion to quash.

## I. Racketeering

¶ 36 The majority opinion decides that the trial court erred in denying Bradshaw's motion to quash the racketeering charge. However, that decision grants neither the trial court, nor the State, the deference to which it is entitled in this setting.[1]

defendant's motion to quash a bindover should not be granted.

In application, the facts of *Clark* gave "rise to two alternate [and reasonable] inferences." *Id.* at ¶ 20. However, the court established earlier in its opinion that our duty is to view " 'all evidence in the light most favorable to the prosecution' " and draw " '*all* reasonable inferences in favor of the prosecution.' " *Id.* at ¶ 10 (citations omitted) (emphasis added). Thus, although the court conceded that the evidence could be interpreted to suggest that the defendants were nothing more than innocent victims, it concluded that the trial court erred in quashing the charges.

In *State v. Schroyer,* 2002 UT 26, 44 P.3d 730, and *State v. Hawatmeh,* 2001 UT 51, 26 P.3d 223, the court was again required to apply the standard that it had adopted in *Clark.* In *Hawatmeh,* the trial court had refused to bind the defendants over on aggravated kidnaping charges. *See Hawatmeh,* 2001 UT 51 at ¶ 2, 26 P.3d 223. On appeal, the supreme court reiterated the bindover standard. *See id.* at ¶¶ 14–15. The court then, after setting forth both the State's and the defendants' theories, stated "[a]lthough defendants' characterizations of the facts may . . . be plausibly inferred from the evidence, there are clearly factual issues that must be resolved at trial, and the facts do not negate the reasonable inferences presented by the State." *Id.* at ¶ 20. The court therefore reversed the trial court's decision and reinstated the aggravated kidnaping charges. *See id.* at ¶ 21.

In *Schroyer,* the defendant challenged the trial court's denial of his motion to quash intentional

¶ 37 Using a truncated standard of review, the majority opinion concludes that the State failed to establish either the existence of, or Bradshaw's investment in, an enterprise.[2] The majority opinion's approach fails to draw all of the reasonable inferences from the evidence in the State's favor.[3] However, before the evidence and inferences can be properly examined, I concede that we must identify what is meant by "enterprise" and determine what evidence satisfies the investment requirement. Accordingly, I follow the majority opinion's lead and "look to ... federal case law for guidance on th[is] issue[ ]." *Buzas Baseball, Inc. v. Salt Lake Trappers, Inc.*, 925 P.2d 941, 947 n. 5 (Utah 1996).

¶ 38 Under federal case law, a section 1962(a) "enterprise"

may very well be a "profit seeking" entity that represents a property interest and may be acquired. But the statutory language ... does not mandate that the enterprise be a "profit-seeking" entity; it simply requires that the enterprise be an entity that was acquired through illegal

---

homicide charges. *Schroyer*, 2002 UT 26 at ¶¶ 9–12, 44 P.3d 730. On appeal, the supreme court reaffirmed its position that "[t]he evidence must be viewed 'in a light most favorable to the prosecution' with all inferences resolved in the prosecution's favor." *Id.* at ¶ 10. More importantly, the court stated "[t]he defendant should be bound over for trial 'unless the evidence is wholly lacking and incapable of reasonable inference to prove some issue which supports the prosecution's claim[.]' " *Id.* (alterations omitted) (quoting *State v. Talbot*, 972 P.2d 435, 437 (Utah 1998)). Furthermore, the court clarified the State's burden at the bindover stage, stating "[a]t this stage of the proceedings, all that the State must do is establish that its theory of [the crime charged] is reasonable." *Id.* at ¶ 12. Consequently, after examining the evidence, the court affirmed the trial court's decision to deny the defendant's motion. *See id.*

In the instant case, the bindover standard applied by the majority opinion is insufficient. Under *Clark* and its progeny, we are required to draw *all* reasonable evidentiary inferences in the state's favor. The majority opinion, instead, draws its inferences in Bradshaw's favor, with predictable results. Although I agree that this case's facts, as presented at the bindover hearing, are insufficient to support a conviction of Bradshaw, they are similar in sufficiency to the evidence presented in *Schroyer*, *Hawatmeh*, and *Clark*. As such, the State presented sufficient evidence to bind Bradshaw over on the racketeering charge.

2. The majority opinion refers to a number of civil RICO cases to support its analysis. I take no issue with its reference to civil cases in this context, nor do I disagree with its assertion that the State is required to prove that the defendant was involved in an enterprise and that funds derived from his racketeering activities enabled the defendant to invest resources in the enterprise.

I would like, however, to highlight that one material difference exists between criminally prosecuting racketeering charges, based on violations of 18 U.S.C.A. § 1962(a), and eligibility to prosecute civilly under the same subsection. To prosecute under section 1962(a), the government must prove "the existence of an enterprise, the defendant's derivation of income from a pattern of racketeering activity, and the use of any part of that income in acquiring an interest in or operating the enterprise." *United States v. Cauble*, 706 F.2d 1322, 1331 (5th Cir.1983). However, when the issue is the civil application of section 1962(a), even if a plaintiff can show each of the elements required for a criminal conviction, they have no standing to sue unless they can show that they suffered damages from the racketeer's investment in the enterprise. *See Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 779 n. 6 (7th Cir.1994) (noting that, under the majority rule, the plaintiff lacked " § 1962(a) standing ... because it has alleged injury only from the alleged predicate acts, not from the investment-use of the converted funds"); *Grider v. Texas Oil & Gas Corp.*, 868 F.2d 1147, 1149 (10th Cir.1989) ("It thus appears from the plain language of these two provisions [(§§ 1962(a) and (c))] that a plaintiff seeking civil damages for a violation of section 1962(a) must plead facts tending to show that he was injured by the use or investment of racketeering income. Injury from the racketeering acts themselves is not sufficient because section 1962(a) does not prohibit those acts."); *Garbade v. Great Divide Mining and Milling Corp.*, 831 F.2d 212, 213 (10th Cir.1987) (same); *Allen v. New World Coffee, Inc.*, No. 00 Civ. 2610, 2002 WL 432685, *4, 2002 U.S. Dist. LEXIS 4624, at **8–10 (S.D.N.Y. Mar. 19, 2002) (same); *Barker v. E.F. Hutton & Co.*, No. C–89–1840, 1990 WL 257283, *3, 1990 U.S. Dist. LEXIS 19039, at *8 (N.D.Cal. July 6, 1990) (same). Thus, civil cases are not perfectly analogous.

3. The decision of the majority opinion to draw no inference in favor of the State because the parties stipulated to the facts presented to the magistrate is without precedent. Moreover, this approach fails take into account that, not only was Bradshaw not forced into accepting the stipulation, he voluntarily entered into it. Consequently, I can discern no reason to penalize the State by refusing to draw all inferences in its

activity or the money generated from illegal activity.

*National Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 259, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994).[4] Additionally, courts have not required prosecutors to plead the facts supporting a racketeering indictment in detail. *See United States v. Habicht,* 766 F.Supp. 22, 26 (D.Mass.1991) ("There is simply no case law to support the defendants' contention that a RICO indictment must plead facts in extraordinary detail."); *Azurite Corp. v. Amster & Co.,* 730 F.Supp. 571, 577 (S.D.N.Y. 1990) (stating that, aside from the fraud itself, the elements of a RICO charge need not be pleaded with particularity). And, in fact, while "three elements are necessary to prove the existence of an enterprise[,]" these elements "are *not* necessary to *plead* a cause of action under the RICO statute." *Federal Ins. Co. v. Ayers,* 741 F.Supp. 1179, 1183 (E.D.Pa.1990). Nor is there any requirement that the person and the enterprise be separate or distinct.[5] *See Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 345 (2d Cir.1994) (stating "there is no requirement under section 1962(a) (as opposed to section 1962(c)) that the 'person' be distinct from the 'enterprise' "); *Banks v. Wolk,* 918 F.2d 418, 421 (3d Cir.1990) (same); *Official Publ'ns, Inc. v. Kable News Co.,* 884 F.2d 664, 668 (7th Cir.1989) (same); *Yellow Bus Lines v. Drivers, Chauffeurs & Helpers Local Union 639,* 883 F.2d 132, 140 (D.C.Cir. 1989) (same).

¶ 39 Consequently, for purposes of interpreting Utah Code section 76–10–1603(1), there is nothing that requires the defendant and the enterprise to be distinct. Nor does the statute require that a section 76–10–1603(1) *charge* be pleaded with any particularity. Instead, the statute only requires that the State's evidence reasonably suggest

(for purposes of bindover) the existence of an enterprise, regardless of its composition.

¶ 40 Similarly,

[s]ection 1962(a) does not exact rigorous proof of the exact course of income derived from a pattern of racketeering activity into its ultimate "use or investment." The key operative terms of the section, as specifically charged here, are expansive, not restrictive ones: "use or invest," "any part," "income ... or ... proceeds," "directly or indirectly," "establishment or operation." In combination these broad, disjunctively-phrased terms negate any requirement that the tainted income must be specifically and directly traced in proof from its original illegal receipt to its ultimately proscribed "use or investment" by the defendant.

*United States v. Vogt,* 910 F.2d 1184, 1194 (4th Cir.1990) (citations omitted). Moreover, federal courts have also determined that savings realized as a result of racketeering activity satisfy the income requirement. *See Azurite Corp.,* 730 F.Supp. at 578 ("The Court cannot find that savings, which are the direct result of fraudulent or otherwise illegal activity, are not income.").

¶ 41 Therefore, to plead a section 76–10–1603(1) violation adequately, the State is not required to produce evidence of direct investment, nor even evidence directly showing the investment of money in an enterprise. Rather, the State must merely produce evidence, again for the specific purpose of bindover, from which a reasonable inference could be drawn that the racketeering activity enabled the defendant to use the proceeds to further his interest in an enterprise.

¶ 42 Here, the stipulated facts demonstrate that Bradshaw engaged in a pattern of unlawful activity from which he realized income. The stipulation further showed that Bradshaw used the funds for his own purposes.

---

favor, as required, and I am certain that the majority opinion errs in doing so.

**4.** Although the Supreme Court uses the term "entity," this should not be interpreted as limiting the scope of what can constitute an enterprise. *See Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 345 (2d Cir.1994) (stating "there is no requirement under

section 1962(a) (as opposed to section 1962(c)) that the 'person' be distinct from the 'enterprise' ").

**5.** At least one circuit has held that "there is no requirement under RICO that an enterprise have an 'ascertainable structure.' " *United States v. Connolly,* 341 F.3d 16, 27 (1st Cir.2003) (citation omitted).

From this information, it takes little effort to draw the reasonable inference that Bradshaw was able to save funds derived from legitimate activity and that he could then invest those saved funds. Moreover, the stipulation can also be reasonably interpreted to suggest that Bradshaw himself was the enterprise and that through this enterprise he was able to collect sensitive information concerning people's financial circumstances, needs, and desires, thus satisfying the enterprise related requirements of section 76–10–1603(1).

¶ 43 Finally, the majority opinion states that "[c]ourts have universally rejected such efforts 'to dress a garden-variety fraud and deceit case in RICO clothing.'" (Quoting *Condict v. Condict*, 826 F.2d 923, 929 (10th Cir.1987).) The majority opinion further seems to suggest that courts must take great care to ensure that only proper defendants are subject to prosecution under Utah's Pattern of Unlawful Activity Act (UPUAA). I decline to subscribe to either of these assertions.

¶ 44 First, Bradshaw's victims would likely not characterize his crimes as "garden-variety," nor would they likely be offended by the racketeering charge.[6] Furthermore, from the evidence before us, it is clear that Bradshaw's crimes required not only a great deal of forethought, planning, and execution on his part, but that in selecting his victims he had access to a great deal of sensitive financial information that should not have been available to him. Moreover, contrary to the majority opinion's desire to describe this and similar situations as "garden-variety fraud and deceit," communications fraud and racketeering may well occur hand-in-glove. *See, e.g., Russello v. United States*, 464 U.S. 16, 17–18, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (reviewing the defendant's convictions for mail fraud and racketeering); *United States v. Turkette*, 452 U.S. 576, 578–81, 101 S.Ct.

2524, 69 L.Ed.2d 246 (1981) (reviewing convictions of racketeering, mail fraud, and "various [other] substantive criminal acts").

¶ 45 In light of Bradshaw's admissions, the majority opinion's analysis is problematic. Although it is possible that a jury might have concluded that the evidence was insufficient to convict Bradshaw of "racketeering," there is nothing in the record that suggests his crimes amounted to nothing more than "garden-variety" fraud. Rather, Bradshaw's crimes evince the image of a profligate con-man, bent on victimizing a large number of susceptible people through the application of a common method, and then using the proceeds to finance his further endeavors.

¶ 46 Second, the majority opinion's concern for potential misuse of racketeering charges, while understandable, finds little support in either the United States Supreme Court, or in the federal courts of appeal. As succinctly stated by the Supreme Court: " 'The occasion for Congress' action was the perceived need to combat organized crime. But Congress for cogent reasons chose to enact a more general statute, one which, although it had organized crime as its focus, was not limited in application to organized crime.' " *National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 260, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (citation omitted). " ' "The fact that RICO has been applied in situations not expressly anticipated by Congress ... demonstrates breadth." ' " *Id.* at 262, 114 S.Ct. 798 (citations omitted). Or, as the First Circuit Court of Appeals stated, " 'Congress has instructed us to construe RICO "liberally ... to effectuate its remedial purposes." ' " *United States v. Connolly*, 341 F.3d 16, 28 (1st Cir.2003) (citations omitted); *see also United States v. Cauble*, 706 F.2d 1322, 1330 (5th Cir.1983) ("RICO's application and effectiveness have been enhanced by the judicial

---

**6.** The case cited by the majority opinion for this proposition is inapplicable to this case. *See Condict v. Condict*, 826 F.2d 923 (10th Cir.1987). *Condict* focused on a civil dispute that arose between family members over ownership interests in a ranch. *See id.* at 924–25. On appeal, following the trial court's dismissal of the claim, the Tenth Circuit Court of Appeals upheld the trial court's decision. However, although the court used the phrase "garden variety fraud and

deceit," the court found that the action had been properly dismissed because, the plaintiffs failed to show both "a pattern of racketeering activities" and the "continuity requirement" required to satisfy section 1962(c). *Id.* at 929 (quotations and citation omitted). In this case, Bradshaw concedes that he engaged in a pattern of racketeering activity, and the continuity requirement of section 1962(c) has no application. Thus, *Condict* is not helpful.

consensus that it may be used even though no organized crime activity is charged[.]"). Consequently, rather than policing the State's decision to charge a defendant with racketeering to avoid its possible thermonuclear effects, our role is more properly limited to determining solely whether the State met its burden; i.e., is the information and evidence sufficient to support bindover?

¶ 47 Here, Bradshaw concedes that he engaged in a pattern of unlawful activity. He also admits to having realized proceeds from the pattern. Thus, the only question left is whether the State presented sufficient information to show, for the purpose of bindover, an enterprise and the use of unlawful proceeds to the benefit of the enterprise.[7]

¶ 48 The State presented evidence that Bradshaw had engaged in a pattern of unlawful activities through which he defrauded a number of people, over a wide geographic range, of an aggregate amount over $5,000. The State's evidence is subject to a reasonable inference that Bradshaw had access to, or was provided with, sensitive information concerning the victims' finances, as well as

their perceived or actual need for money. The evidence can also be reasonably interpreted to support an inference that Bradshaw used the proceeds to fund his existence, his lifestyle, and his ongoing efforts to defraud additional victims. This evidence, and all reasonable inferences that can be made from it, demonstrate that probable cause existed to believe that Bradshaw's activities amounted to racketeering.[8] *See Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 345 (2d Cir.1994) (stating "there is no requirement under section 1962(a) (as opposed to section 1962(c)) that the 'person' be distinct from the 'enterprise' "); *Official Publ'ns., Inc. v. Kable News Co.*, 884 F.2d 664, 668 (2d Cir.1989) ("Thus, under [section] 1962(a), it may be possible for a defendant to also be the enterprise."); *accord American Mfrs. Mut. Ins. Co. v. Townson*, 912 F.Supp. 291, 295 (E.D.Tenn.1995) (finding that a marriage can satisfy the enterprise requirement for section 1962(c) claims). Consequently, the trial court properly denied Bradshaw's motion to quash the bindover order on the racketeering

---

7. In concluding that the State failed to show that there was probable cause to believe that Bradshaw was involved in an enterprise, the majority opinion relies on *State v. Bell*, 770 P.2d 100 (Utah 1988). Although the majority opinion concedes that *Bell* reached the supreme court in a different procedural posture, its opinion fails to clearly identify the key differences.

In *Bell*, the defendant was convicted of racketeering by a jury. *See id.* at 101. He appealed and his conviction was reversed. *See id.* The supreme court found that the state had failed to provide the defendant with a court ordered bill of particulars. *See id.* at 105. Consequently, the supreme court concluded that the defendant's defense efforts had been irreparably prejudiced by the state's inaction. *See id.* at 106 ("The specific question, then, is whether the State's failure to notify [the defendant] of these three factual bases for the allegations of [an] enterprise so impeded his ability to prepare a defense to those allegations as to require reversal under rule 30" of the Utah Rules of Criminal Procedure.). Specifically, the court found that the defendant was not provided with the required notice that would have enabled him to adequately prepare his defense. *See id.* at 107.

Significantly, *Bell* nowhere discussed the subject of probable cause, nor did the supreme court suggest that the indictment filed against the defendant was not supported by probable cause. Moreover, at no point in *Bell* does the court even intimate that the defendant had been bound over improperly. Rather, the court focused its attention on the state's "failure to provide an adequate bill of particulars" and concluded that said failure "unfairly prejudice[d the defendant's] ability to prepare and present a defense" at trial. *Id.* at 107.

Consequently, the court in *Bell* was focused on the fairness of the defendant's trial, and although the enterprise issue was discussed, the discussion focused solely on the proof *that is necessary to convict* under our racketeering statute. *See id.* at 103 n. 2. Accordingly, I do not believe that *Bell* assists in resolving the instant case, nor does *Bell* offer any material assistance to the analysis of the issue before this court. Had Bradshaw desired, he could have relied upon *Bell* to demand a bill of particulars, and the State would have been required to provide those particulars.

8. While not necessary, it is also clear that the facts and reasonable inferences supporting Bradshaw's pattern of unlawful conduct are distinct from the facts and inferences that would tend to show that he, himself, was the enterprise and that he somehow used his ill-gotten gains to the benefit of the enterprise. *But see State v. Hutchings*, 950 P.2d 425, 432 (Utah Ct.App.1997) (noting "the Utah Supreme Court has implicitly ruled that the same set of facts used to prove the pattern of unlawful activity can be used to prove the existence of an enterprise").

charge.[9]

## II.   Communications Fraud

¶ 49 I disagree with the majority opinion's decision to focus its analysis on the word "scheme" in its interpretation and application of the communications fraud statute.  I am also concerned with the problematic determination that the word "another," as used in the statute, should be interpreted solely in the singular.  Accordingly, I disagree with the majority opinion's reliance upon these terms to conclude that the statute is ambiguous and that, under the rule of lenity, the State is precluded from charging Bradshaw as it did.  Finally, I disagree with the majority opinion's foray into policy discussion, which is, in this instance, an inappropriate invasion of the legislature's province.

¶ 50 The majority opinion parses the language of section 76–10–1801 to determine that the statute's operative and controlling term is "scheme."  However, in doing so, the majority opinion ignores both the plain language of the statute and our duty to " 'avoid interpretations that will render portions of a statute superfluous or inoperative.' "  *State v. Martinez*, 2002 UT 80, ¶ 8, 52 P.3d 1276 (quoting *Hall v. Department of Corr.*, 2001 UT 34, ¶ 15, 24 P.3d 958).  Section 76–10–1801, in relevant part, reads:

> Any person who has devised *any scheme or artifice to defraud* another or to obtain from another money, property, or anything of value by means of false or fraudulent pretenses, representations, promises, or material omissions, and who communicates directly or indirectly with any person by any means for the purpose of executing or concealing *the scheme or artifice* is guilty[ of communications fraud.]

Utah Code Ann. § 76–10–1801(1) (1999) (emphasis added).

¶ 51 It is clear from the statutory plain language that the legislature chose the phrase "scheme or artifice to defraud" in articulating the conduct prohibited by the statute.  The majority opinion, however, ignores the legislature's clear indication of its intent.  Consequently, the interpretation fails to give effect to the statute's unambiguous language, and instead adopts an interpretation that renders "portions of the statute superfluous or inoperative,' "  *Martinez*, 2002 UT 80 at ¶ 8, 52 P.3d 1276 as well as a reading that " 'contradict[s] its plain meaning.' "  *State v. Burns*, 2000 UT 56, ¶ 25, 4 P.3d 795 (citation omitted).

¶ 52 The majority opinion's approach then uses its interpretation of "scheme" as a springboard for its determination that the word "another" must be viewed in the singular.  However, beyond its reliance on the term "scheme," the majority opinion offers little substantive support for its interpretation of "another."  This approach ignores our duty to interpret such words fluidly, offering both plural and singular application, unless such an interpretation would be "inconsistent with the *manifest* intent of the Legislature or repugnant to the context of the statute."  Utah Code Ann. § 68–3–12(1) (2000) (emphasis added).  Because section 76–10–1801 contains no such limiting language, we must presume that the legislature intended "another" to refer to one or more people.  Thus, the plain language of section 76–10–1603 does not support the majority opinion's reading.

¶ 53 The meaning of section 76–10–1603 is clear and no ambiguity exists.  Without ambiguity, the majority opinion's lenity discussion is unnecessary and inapplicable.  *See National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 262, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (stating "the rule of lenity applies only when an ambiguity is present; ' "it is not used to beget one.... The rule comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." ' " (citations omitted) (ellipsis in original)).  Similarly, the majority opinion's foray into policy

---

9. Although the evidence presented at the bindover hearing is sufficient to survive a motion to quash, I agree that absent more, the evidence is probably insufficient to convict Bradshaw of racketeering.  However, based upon the supreme court's instruction that we assume the State's case will only get stronger, *see State v. Clark*, 2001 UT 9, ¶ 10, 20 P.3d 300, the trial court properly denied Bradshaw's motion to quash.

is equally inadvisable. As noted by our supreme court:

> "We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people.
>
> . . . .
>
> '[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people.' "

*State v. Mace*, 921 P.2d 1372, 1377 (Utah 1996) (alteration in original) (citation omitted); *see also State v. Herrera*, 895 P.2d 359, 362 (Utah 1995) (noting that policy discussions are "better accomplished in the legislature than in the courts"); *Sullivan v. Scoular Grain Co.*, 853 P.2d 877, 883 (Utah 1993) (stating that in the absence of ambiguity, courts are not "free to assess the wisdom of a statutory scheme" (quotations and citation omitted)).[10]

¶ 54 Accordingly, we are called upon to determine whether the State's decision to charge Bradshaw with multiple felony counts of communications fraud was proper under the plain language of the statute. Section 76–10–1801 reads, in relevant part:

> Any person who has devised any scheme or artifice to defraud another . . . and who communicates directly or indirectly with any person by any means for the purpose of executing or concealing the scheme or artifice is guilty of:
>
> . . . .
>
> a class A misdemeanor when the value of the property, money, or thing obtained or sought to be obtained is or exceeds $300 but is less than $1,000; . . . a second de-

gree felony when the value of the property, money, or thing obtained or sought to be obtained is or exceeds $5,000;

> . . . .
>
> The determination of the degree of any offense . . . shall be measured by the total value of all property, money, or things obtained or sought to be obtained by the scheme or artifice. . . .
>
> . . . .
>
> Each separate communication made for the purpose of executing or concealing a scheme or artifice . . . is a separate act and offense of communications fraud.

Utah Code Ann. § 76–10–1801 (1999). The statute's plain language suggests that the statute's scope is defined by the meaning and application of the phrase "scheme or artifice to defraud."

¶ 55 "[S]cheme or artifice to defraud" is widely defined to mean "the overall design to defraud one or many by means of a common *plan or technique*." *United States v. Massey*, 48 F.3d 1560, 1566 (10th Cir.1995) (emphasis added); *see also United States v. Rogers*, 321 F.3d 1226, 1229 (9th Cir.2003). In *Massey*, the defendants were convicted of, inter alia, eight counts of mail fraud. *See Massey*, 48 F.3d at 1564. On appeal, the defendants argued that application and meaning of the phrase " 'scheme or artifice to defraud' is limited to each individual defrauded client." *Id.* at 1566 (citation omitted). The court, in response, stated that not only was the defendants' argument spurious and unsupported, but that " 'scheme to defraud' has a wider meaning than an individual act of fraud." *Id.* It is better defined as "the overall design to defraud *one or many* by means of a *common plan or technique*." *Id.* (emphases added); *see also United States v. Sampson*, 371 U.S. 75, 78–81, 371 U.S. 75,

---

**10.** This case, regardless of the outcome, involves nothing more than standard statutory interpretation. *See State v. Hardy*, 2002 UT App 244,¶ 10, 54 P.3d 645 (stating " '[w]hen language is clear and unambiguous, it must be held to mean what it expresses, and no room is left for construction' " (citation omitted)). The language of the communications fraud statute is not ambiguous. In fact, because both the majority opinion and the dissent ultimately rest their analyses on whether Bradshaw's conduct followed a com-

mon method or technique, it would seem that we agree on the meaning of Utah Code section 76–10–1603. Our disagreement rests instead in the application of the statute and not in its meaning. Thus, the majority opinion's policy discussion strays into an area of construction not properly before this court. *See State v. Herrera*, 895 P.2d 359, 362 (Utah 1995) (stating "[e]ven if a court finds certain legislation unreasonable or unwise, that alone does not mean it has authority to invalidate it").

9 L.Ed.2d 136(1962) (holding that activities in support of fraudulent activity, but not directly fraudulent in and of themselves, can also be considered violative of the federal mail fraud statute). Thus, because the meaning of the phrase "scheme or artifice to defraud" has a clear historical usage, we must presume that the legislature was aware of its meaning when it chose to use the phrase in criminalizing communications fraud. Consequently, we must also presume that the legislature intended the statute to be applied to any "common plan or technique" used by a defendant to "defraud one or many [people or entities.]" *Massey,* 48 F.3d at 1566.[11]

¶ 56 Here, Bradshaw stipulated to the facts underlying the charged conduct. That conduct clearly suggests that all of Bradshaw's efforts involved one common plan or technique. Simply put, Bradshaw somehow gained access to several people's sensitive financial information. From this information, Bradshaw chose his victims. He chose them because they desperately wanted or needed money to refinance their residences. Bradshaw then approached each victim and told each a similar or nearly identical story. He told each that he owned, solely or in part, a mortgage company and that he wanted to help them acquire their desired refinancing. He then told them that he needed a certain amount of money up front, to perform a variety of finance related tasks, before the victims could obtain their desired refinancing. Each of the eleven named victims gave Bradshaw the requested amount, never more than $600.00, after which Bradshaw disappeared from their lives, never performing

even one of the promised services.[12] Because Bradshaw used the same method or technique to defraud all of the victims, his conduct amounted to one "scheme or artifice to defraud." Consequently, the only task remaining to this court should be ensuring that the statute was properly applied to Bradshaw.

¶ 57 Under section 76–10–1801(2), the severity of the charges levied against Bradshaw must be "measured by the total value of all ... money ... obtained ... by the scheme or artifice described in Subsection (1)." Utah Code Ann. § 76–10–1801(2). Having concluded that Bradshaw engaged in a single "scheme or artifice to defraud," nothing remains other than simple arithmetic. From the stipulated facts, Bradshaw's "scheme or artifice to defraud" yielded him over $5,000.00. Accordingly, under the statute's plain language, each *communication* that Bradshaw made in furtherance of his "scheme or artifice to defraud" could be charged as a felony in the second degree, because the statute criminalize the communication itself, not the successful completion of the involved fraudulent scheme. *See id.* § 76–10–1801(1)(d), (2), (5).

¶ 58 Finally, under section 76–10–1801(5), "[e]ach separate communication [Bradshaw] made for the purpose of executing or concealing a scheme or artifice described in Subsection (1) is a separate act and offense of communication fraud." *Id.* § 76–10–1801(5). Here, Bradshaw stipulated that he had made or attempted at least eleven separate communications in furtherance of his "scheme or artifice to defraud." Consequently, under

11. This outcome is further supported by reference to the commonly accepted definition of the words "to defraud." As stated by the United States Supreme Court, "the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" *McNally v. United States,* 483 U.S. 350, 358, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (quoting *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 68 L.Ed. 968 (1924)).

12. The majority opinion suggests that these facts do not equate to a single scheme or artifice to defraud, because the "[t]he victims were deceived at different times, in different places, by different stories, and through different methods."

I am puzzled by the majority opinion's conclusion that Bradshaw approached the victims "through different methods" when it is clear from the evidence the he used one method with just a few minor variations. Moreover, the majority opinion's approach seems to be contrary to both *United States v. Sampson,* 371 U.S. 75, 76–77, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962), where "[t]he individual defendants were officers, directors, and employees of a large, nationwide corporation [who] purported to be able to help businessmen obtain loans or sell out their businesses," and *United States v. Massey,* 48 F.3d 1560 (10th Cir.1995), where the defendant operated an illegal pyramid lending scheme, which affected multiple victims.

the plain language of sections 76–10–1801(1) and 76–10–1801(5), Bradshaw committed eleven separate violations. *See* Utah Code Ann. § 76–10–1801(1) ("Any person who has devised any scheme or artifice to defraud another ... who communicates directly or indirectly with any person by any means for the purpose of executing or concealing the scheme or artifice is guilty" of violating the statute.).[13]

¶ 59 By its plain language, the legislature has decided to punish each act of communication in furtherance of a "scheme or artifice to defraud," and determined that each such act is to be punished based on the aggregate amount reaped through the scheme. Therefore, the State's decision to charge Bradshaw with eleven second degree felony communications fraud charges was proper, and the trial court correctly refused to reduce either the number or the degree of the charges.

## V. CONCLUSION

¶ 60 I disagree with the majority opinion's analyses, its lack of deference to legislative intent, and its ultimate conclusions. I believe that the trial court properly denied Bradshaw's motion to quash the racketeering charge. Under our bindover standard, articulated in *State v. Clark*, 2001 UT 9, ¶ 10–16, 20 P.3d 300, the State's evidence established sufficient probable cause to believe that Bradshaw violated the statute.

¶ 61 I am further convinced that the trial court correctly denied Bradshaw's motion to reduce either the degree or the number of communications fraud charges. Bradshaw used one common plan or method to defraud his victims; thus, his entire crime spree utilized one "scheme or artifice to defraud," subjecting him to the increased number and level of charges. Consequently, I would conclude that both the number of charges and the charging level were appropriate for the conduct, and I would therefore affirm the decision of the trial court.

---

**13.** The majority opinion voices concern about the possibility that Bradshaw faced a possible 165–year sentence if convicted of each count and if the trial court sentenced him to serve each term consecutively. However, pursuant to Utah Code section 76–3–401(6)(a) (2003), Bradshaw faced a maximum of 30–years incarceration if he were convicted of all charges and sentenced to serve each term consecutively. *See* Utah Code Ann. § 76–3–401 (limiting the amount of time that a convicted person will serve under Utah's sentencing laws). Moreover, although the majority opinion suggest that the sentence Bradshaw possibly faced "is repugnant to notions of traditional" justice, I would suggest that Bradshaw's victims, some of whom may have faced financial ruin-and the possible loss of their businesses and homes-due to his activities, would believe a sentence of 165 years to be reasonable.